FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JORGE ALEJANDRO ROJAS,
*Plaintiff-Appellant*,

v.

FEDERAL AVIATION
ADMINISTRATION,
*Defendant-Appellee.*

No. 17-55036

D.C. No.
2:15-cv-05811-
CBM-SS

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted En Banc September 22, 2020
San Francisco, California

March 2, 2021

Before: Sidney R. Thomas, Chief Judge, and Susan P.
Graber, Kim McLane Wardlaw, Johnnie B. Rawlinson,
Consuelo M. Callahan, Milan D. Smith, Jr., Sandra S.
Ikuta, Paul J. Watford, Andrew D. Hurwitz, Daniel P.
Collins, and Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Watford;
Concurrence by Judge Collins;
Partial Concurrence and Partial Dissent by Judge Wardlaw;

Partial Concurrence and Partial Dissent by
Chief Judge Thomas;
Partial Dissent by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Bumatay

## SUMMARY[*]

### Freedom of Information Act

The en banc court affirmed in part and vacated in part the district court's summary judgment in favor of the Federal Aviation Administration ("FAA") in a plaintiff's Freedom of Information Act ("FOIA") action seeking FAA agency records.

FOIA's Exemption 5 provides that FOIA's disclosure requirements do not apply to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). The FAA's Office of Chief Counsel informed plaintiff that it was withholding three documents from his FOIA requests under Exemption 5. The validation documents that the FAA sought to withhold were prepared by an outside consultant rather than by an FAA employee.

The en banc court joined six sister circuits that have recognized some version of the consultant corollary to Exemption 5, and held that the term "intra-agency" in § 552(b)(5) included, at least in some circumstances, documents prepared by outside consultants hired by the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

agency to assist in carrying out the agency's functions. The court held that the relevant inquiry asks whether the consultant acted in a capacity functionally equivalent to that of an agency in creating the document or documents the agency sought to withhold.

Applying these principles, the en banc court concluded that the consultant, APTMetrics, created the three documents at issue while performing work in the same capacity as an employee of the FAA. APTMetrics represented neither its own interests nor those of any other client in carrying out its work, and it did not share the documents with anyone outside the FAA's Office of Chief Counsel. With respect to the preparation of the documents, APTMetrics was operating enough like the FAA's own employees to justify calling its own communications with the FAA "intra-agency."

Because the documents at issue qualified as intra-agency memorandums, the en banc court next considered whether they satisfied Exemption 5's second requirement that the documents "would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). The court, agreeing with the district court, held that two of the three documents listed in the *Vaughn* index were protected by the attorney work-product privilege and thus could not be subject to discovery in civil litigation with the FAA. A remand, however, was necessary to determine whether the third document was also protected by privilege; and the court vacated the district court's summary judgment for the FAA as to the third document.

The en banc court addressed plaintiff's arguments concerning the adequacy of the FAA's search for responsive documents. First, the court held that Supreme Court precedent foreclosed plaintiff's contention that the FAA

should have been required to search APTMetrics' records for documents responsive to his FOIA request. Second, the court held that the declarations submitted by the FAA failed to show that it conducted a search reasonably conducted to uncover all relevant documents.

The en banc court remanded for further proceedings.

Judge Collins joined in the majority opinion that adopted the reading of Exemption 5 endorsed by Justice Scalia in his dissenting opinion in *U.S. Department of Justice v. Julian*, 486 U.S. 1 (1988), and wrote separately to respond to the dissents' erroneous contentions that Justice Scalia's reading of Exemption 5 was "atextual."

Judge Wardlaw, joined by Chief Judge Thomas and Judge Hurwitz, concurred in part and dissented in part. Judge Wardlaw would hold that Exemption 5's text is crystal clear:   documents or communications exchanged with *outside* consultants do not fall within that exemption.  She agreed with the majority that the FAA's search for records was inadequate, and joined part III of the majority opinion.

Chief Judge Thomas concurred in part and dissented in part.  He joined Judge Wardlaw's dissent in full, and also agreed with the majority opinion's holding that the FAA did not meet its burden to show that it conducted an adequate search for documents responsive to plaintiff's FOIA request. He wrote separately to observe that, even if the consultant corollary formed part of Exemption 5, it would not protect the specific information sought in this case because the information was required to be maintained and made publicly available by the agency.

Judge Ikuta, joined by Judges Graber and Callahan, and joined by Judge Bumatay except as to footnote 1, dissented

in part. Judge Ikuta disagreed with the majority's conclusion that the declaration submitted by the FAA failed to show that the agency conducted a search reasonably calculated to uncover all relevant documents in response to the FOIA request. In footnote 1, Judge Ikuta stated that she agreed with the majority's interpretation of "intra-agency memorandums or letters" to include documents prepared by outside consultants hired by the agency to assist its functions, and she would affirm the summary judgment for the FAA as to the first two withheld documents, and reverse as to the third document for the reasons stated in the majority opinion.

Judge Bumatay concurred in part and dissented in part. He would hold that FOIA Exemption 5 does not cover consultant work product, and by its plain text, it does not protect APTMetric's documents from disclosure. He agreed with the majority that the FAA was not required to search APTMetric's records for responsive documents, but agreed with Judge Ikuta's dissent that the majority was incorrect in finding that FAA's search was inadequate.

**COUNSEL**

Naomi J. Scotten (argued), Orrick Herrington & Sutcliffe LLP, New York, New York; Michael W. Pearson, Curry Pearson & Wooten PLC, Phoenix, Arizona; Robert M. Loeb and Thomas M. Bondy, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; for Plaintiff-Appellant.

Jeffrey E. Sandberg (argued), and Mark B. Stern, Appellate Staff; Hashim M. Mooppan, Deputy Assistant Attorney General, Washington, D.C.; Alarice M. Medrano, Assistant United States Attorney; Dorothy A. Schouten, Chief, Civil

Division; United States Attorney's Office, Los Angeles, California; for Defendant-Appellee.

Katie Townsend, Caitlin Vogus, Adam A. Marshall, Gunita Singh, and Daniel J. Leon, Reporters Committee for Freedom of the Press, Washington, D.C., for Amici Curiae Reporters Committee for Freedom of the Press and 24 Media Organizations.

Gregg P. Leslie, Samuel Turner, and John Dragovits, First Amendment Clinic, Arizona State University, Sandra Day O'Connor College of Law, Phoenix, Arizona, for Amicus Curiae Project on Government Oversight.

**OPINION**

WATFORD, Circuit Judge:

To ensure greater transparency in the operation of government agencies, the Freedom of Information Act (FOIA) mandates disclosure of nearly all agency records upon request, unless the records fall within one of nine exemptions specified in the Act. *See* 5 U.S.C. § 552(b)(1)–(9); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975). This case involves Exemption 5, which provides that FOIA's disclosure requirements do not apply to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). The main question before us is what the term "intra-agency" means in this context. Does a document qualify as "intra-agency" only if the author and recipient are employees of the same agency? Or does the term also include, at least in some circumstances, documents prepared by outside consultants hired by the agency to assist in carrying out the agency's functions? We join six of our sister circuits in adopting the latter reading of "intra-agency," dubbed by some the "consultant corollary" to Exemption 5.

I

The plaintiff in this case is Jorge Alejandro Rojas. In March 2015, Rojas applied to the Federal Aviation Administration (FAA) for an entry-level position as an air traffic controller. As part of the application process, he took a computerized test designed to measure certain attributes deemed relevant to success in the position, such as self-confidence, stress tolerance, and teamwork. The parties refer to this test as the "biographical assessment." The FAA rejected Rojas's application in a notice that stated the

following: "Based upon your responses to the Biographical Assessment, we have determined that you are NOT eligible for this position as a part of the current vacancy announcement." The notice informed Rojas that the biographical assessment measures "job applicant characteristics that have been shown empirically to predict success as an air traffic controller," and stated that the test "was independently validated by outside experts."

Rojas understandably wanted to learn more about the FAA's use of the biographical assessment as a selection tool—in particular, whether the test had been empirically validated (that is, shown to have the power to predict successful job performance) as the FAA claimed. At the time, little was known about the test, as it had been deployed for the first time during the previous year's hiring cycle, in February 2014, at the recommendation of an outside consulting firm called APTMetrics. The FAA had hired the firm in 2012 to review the agency's hiring process, to propose recommendations for improvement, and to assist the agency in implementing those improvements. APTMetrics developed the biographical assessment as part of that work and, after its debut during the 2014 hiring cycle, revised the test for use in the upcoming 2015 hiring cycle. In early fall of 2014, APTMetrics performed validation work on the revised 2015 version of the test, work that presumably formed the basis for the FAA's claim that the test had been "independently validated by outside experts."

Under FOIA, Rojas asked the FAA to produce documents containing "information regarding the empirical validation of the biographical assessment" mentioned in his rejection notice, including "any report created by, given to, or regarding APTMetrics' evaluation and creation and scoring of the assessment."

The FAA assigned Rojas's request to four different offices within the agency: Air Traffic Organization, FOIA Program Management Branch, Office of Human Resources, and the Employment and Labor Law Division of the Office of the Chief Counsel. The Office of Human Resources informed Rojas that it had found responsive documents relating to empirical validation of the biographical assessment but was withholding those documents under Exemption 5. The Office of the Chief Counsel similarly informed Rojas that it had located responsive documents but was withholding them under Exemption 5 as well. Following Rojas's administrative appeal of that decision, the Office of the Chief Counsel realized that its search had mistakenly focused on the 2014 biographical assessment, rather than on the 2015 version of the test that was the subject of Rojas's FOIA request. The office conducted a second search, which produced the three documents at issue in this appeal. The FAA informed Rojas that it was withholding all three documents under Exemption 5.

Rojas sued the FAA under FOIA, which authorizes district courts "to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). For reasons that are unclear from the record, Rojas's suit does not challenge the Office of Human Resources' withholding of documents under Exemption 5. He challenges only the Office of the Chief Counsel's decision to withhold documents under that exemption.

The FAA bears the burden of establishing that the documents it seeks to withhold are covered by Exemption 5. *See* 5 U.S.C. § 552(a)(4)(B); *Lahr v. National Transportation Safety Board*, 569 F.3d 964, 973 (9th Cir.

2009). The FAA sought to meet that burden by submitting a "*Vaughn* index," a document that identifies the records being withheld, the exemption invoked to justify withholding, and the reason why each document is subject to the claimed exemption. *See Hamdan v. Department of Justice*, 797 F.3d 759, 769 n.4 (9th Cir. 2015) (citing *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)). The FAA's *Vaughn* index described the three documents at issue here. For each, the FAA identified APTMetrics as the sender and the FAA's Office of the Chief Counsel as the recipient; stated that the documents' subject matter was development and validation of the 2015 biographical assessment; invoked Exemption 5 as the ground for withholding; and explained that the documents had been prepared by APTMetrics at the request of lawyers in the Office of the Chief Counsel in anticipation of litigation.

The FAA submitted two declarations providing factual support for its claim that the documents had been prepared in anticipation of litigation and were therefore protected by the attorney work-product privilege. A declaration from a lawyer in the FAA's Office of the Chief Counsel explained that in April 2014, after the agency's use of the biographical assessment during the 2014 hiring cycle, an unsuccessful applicant filed a putative class action against the agency alleging discrimination. In November 2014, the Office of the Chief Counsel asked the Chief Operating Officer of APTMetrics, John Scott, "to summarize elements of his validation work" related to the revised version of the biographical assessment that the agency planned to use during the upcoming 2015 hiring cycle. Scott provided summaries of his validation work in December 2014 and January 2015. According to the declaration, those summaries "were prepared solely at the request and direction of the Office of the Chief Counsel and were not shared with

other elements of the [FAA] outside of the Office of the Chief Counsel." Mr. Scott submitted a declaration of his own confirming that APTMetrics had prepared "summaries and explanations" of its validation work at the request of lawyers in the Office of the Chief Counsel.

On the basis of the *Vaughn* index and supporting declarations, the FAA moved for summary judgment. After reviewing the three documents *in camera*, as FOIA permits, *see* 5 U.S.C. § 552(a)(4)(B), the district court granted summary judgment for the FAA. The court held that the documents were properly subject to withholding under Exemption 5 and rejected Rojas's challenges to the adequacy of the agency's search for responsive documents.

A three-judge panel of our court reversed. *Rojas v. FAA*, 927 F.3d 1046 (9th Cir. 2019). The panel divided on the question whether the documents at issue are covered by Exemption 5. Over Judge Christen's dissent, a majority of the panel held that they are not. The majority declined to adopt the consultant corollary to Exemption 5, which it regarded as inconsistent with the statute's plain text and FOIA's general policy of fostering broad disclosure of agency records. *Id.* at 1055–58. Because the validation documents the FAA sought to withhold were prepared by an outside consultant rather than by an FAA employee, the majority concluded that the documents do not qualify as "intra-agency memorandums." *Id.* at 1058. The panel also held, unanimously, that while the FAA was not obligated to search APTMetrics' records in response to Rojas's FOIA request, the agency failed to establish that the search it conducted of its own records was reasonably calculated to locate all responsive documents. *Id.* at 1053–54, 1059 (majority opinion); *id.* at 1060 (Christen, J., concurring in part and dissenting in part). Thus, the panel reversed the

district court's entry of summary judgment in the FAA's favor. *Id.* at 1059–60.

A majority of the non-recused active judges voted to rehear the case en banc, principally to decide whether our circuit should adopt or reject the consultant corollary to Exemption 5.

## II[1]

Exemption 5 permits an agency to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). Successful invocation of the exemption requires an agency to show that a document (1) is "inter-agency" or "intra-agency" in character, and (2) consists of material that would be protected as privileged in the civil discovery context. *Sears*, 421 U.S. at 149. We address each of these requirements in turn.

## A

APTMetrics is not a federal agency in its own right, *see* 5 U.S.C. §§ 551(1), 552(f)(1), so the three documents it prepared and sent to the FAA cannot be deemed "inter-agency" memorandums. At first blush, documents prepared by APTMetrics would not appear to qualify as "*intra-agency*" memorandums either. "Intra" means "within," and read in isolation, "the most natural meaning of the phrase 'intra-agency memorandum' is a memorandum that is addressed both to and from employees of a single agency." *Department of Justice v. Julian*, 486 U.S. 1, 18 n.1 (1988)

---

[1] Judges Graber, Rawlinson, Callahan, M. Smith, Ikuta, and Collins join in this part of the majority opinion.

(Scalia, J., dissenting). But as is always true when interpreting statutes, statutory context and purpose matter, and here we think context and purpose suggest that Congress had in mind a somewhat broader understanding of "intra-agency."

Read in context, the term "intra-agency" in Exemption 5 does not definitively resolve the interpretive question before us. Even accepting that "intra-agency" refers in this context to a document generated and kept in-house, that still does not tell us who counts as being in-house for purposes of the exemption's reach. The term *could* be read as requiring that both the author and recipient of the document be employees on the agency's payroll. But it could just as plausibly be read to include certain outside consultants whom the agency has hired to work in a capacity functionally equivalent to that of an agency employee.

Deciding which of these two interpretations of "intra-agency" Congress had in mind should be informed, in our view, by consideration of the purposes served by Exemption 5. The exemption protects an agency's internal communications (as well as communications with other agencies) if those communications would be protected by one of the civil discovery privileges, such as the attorney-client privilege, the attorney work-product privilege, or the deliberative process privilege. *See Sears*, 421 U.S. at 149. Congress concluded that shielding privileged communications from disclosure was desirable because "the 'frank discussion of legal or policy matters' in writing might be inhibited if the discussion were made public," with the consequence that the quality of an agency's decisions and policies "would be the poorer as a result." *Id.* at 150 (quoting S. Rep. No. 89-813, at 9 (1965)). In the same vein, the Court observed in *Sears* that "those who expect public

dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process." *Id.* at 150–51 (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)) (emphasis omitted). In addition, without the protection afforded by Exemption 5, an agency's litigation opponents could obtain under FOIA the same privileged communications they were barred from obtaining under civil discovery rules. Asked whether the statute created such an "anomaly," the Court said no, stating: "We do not think that Congress could have intended that the weighty policies underlying discovery privileges could be so easily circumvented." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 801–02 (1984).

A Congress whose aim was to further the purposes just discussed would not have limited Exemption 5's coverage to communications authored by agency employees. Outside consultants would presumably be just as hesitant as agency employees to engage in frank discussion of legal and policy matters if they know that their advice and analysis may be made public, with the same detrimental effect on the quality of the agency's decision-making. And an agency's litigation opponents could use FOIA to circumvent civil discovery privileges just as effectively whether the privileged communications to be disclosed were between the agency and its outside consultants or between agency employees. Reading Exemption 5 to exclude communications with outside consultants altogether, as Rojas urges us to hold, would require us to assume that Congress saddled agencies with a strong disincentive to employ the services of outside experts, even when doing so would be in the agency's best interests. We see no evidence to support that assumption in FOIA's text or its legislative history.

The implausibility of Rojas's interpretation of the phrase "intra-agency memorandums"—as mandating authorship by agency employees—is illustrated perhaps most starkly in the context of an agency's hiring of outside counsel to represent it in litigation. Under ordinary privilege rules, the agency's litigation opponent could not, of course, demand disclosure of written communications between the agency and its outside attorney or production of the attorney's work-product. Yet under Rojas's reading of Exemption 5, all of those otherwise privileged materials would be subject to public disclosure under FOIA—at the request of the agency's litigation opponent or anyone else. It seems doubtful that Congress intended the term "intra-agency" in Exemption 5 to exclude outside attorneys, because doing so would, for all practical purposes, preclude agencies from relying on the services of outside counsel in most instances. Indeed, even Rojas appears to acknowledge that outside attorneys must be deemed "within" an agency for purposes of Exemption 5, but he offers no principled basis on which an agency's outside attorneys could be distinguished from other outside consultants hired to assist in carrying out the agency's functions.

Given these considerations, we do not agree that Rojas's reading of the term "intra-agency" is the only textually permissible interpretation of Exemption 5's scope. While we are mindful of our obligation to construe FOIA's exemptions narrowly, we must at the same time give them "a fair reading," just as we would any other statutory provision. *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019). In our view, a fair reading of the term "intra-agency" is the one acknowledged by the Supreme Court in *Department of Interior v. Klamath Water Users Protective Association*, 532 U.S. 1 (2001). There, without accepting or rejecting the consultant corollary, the

Court noted the then-uniform view of lower courts that, in certain circumstances, "consultants may be enough like the agency's own personnel to justify calling their communications 'intra-agency.'" *Id.* at 12. As Justice Scalia stated in *Julian*, that reading of Exemption 5 is not only "textually possible" but also "much more in accord with the purpose of the provision." *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting). We therefore join the six other circuits that have recognized some version of the consultant corollary to Exemption 5.[2]

As for identifying those consultants who "may be enough like the agency's own personnel to justify calling their communications 'intra-agency,'" the Supreme Court's decision in *Klamath* provides helpful guidance. Although the Court did not endorse the consultant corollary, it distilled general principles gleaned from lower court decisions that we think define the outer boundaries of Exemption 5's reach. To be deemed "within" an agency for purposes of Exemption 5, a consultant must be hired by the agency to perform work in a capacity similar to that of an employee of the agency, such that "the consultant functions just as an employee would be expected to do." *Klamath*, 532 U.S.

---

[2] *See Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971); *Government Land Bank v. General Services Administration*, 671 F.2d 663, 665 (1st Cir. 1982); *Lead Industries Association, Inc. v. OSHA*, 610 F.2d 70, 83 (2d Cir. 1979); *Hanson v. U.S. Agency for International Development*, 372 F.3d 286, 292–93 (4th Cir. 2004); *Wu v. National Endowment for Humanities*, 460 F.2d 1030, 1032 (5th Cir. 1972); *Stewart v. Department of Interior*, 554 F.3d 1236, 1245 (10th Cir. 2009); *cf. Brockway v. Department of Air Force*, 518 F.2d 1184, 1194 (8th Cir. 1975) (holding that Exemption 5 includes some witness statements provided to the Air Force as part of an investigation). The only circuit arguably to question the validity of the consultant corollary thus far is the Sixth. *See Lucaj v. FBI*, 852 F.3d 541, 548–49 (6th Cir. 2017).

at 10–11. That means the consultant must "not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Id.* at 11. Its obligations must be solely "to truth and its sense of what good judgment calls for." *Id.*

Because the scope of Exemption 5 turns on the character of the document at issue—it is the memorandum or letter that must be "intra-agency"—these principles should be applied on a document-by-document basis. The relevant inquiry asks not whether the "consultant functions just as an employee would be expected to do" in a general sense, but rather whether the consultant acted in a capacity functionally equivalent to that of an agency employee in creating the document or documents the agency seeks to withhold.

Applying these general principles here, we conclude that APTMetrics created the three documents at issue while performing work in the same capacity as an employee of the FAA. The FAA's Office of the Chief Counsel asked APTMetrics to prepare summaries of its validation work to assist the agency's lawyers in defending the validity of the 2015 biographical assessment. In creating each of the three documents, APTMetrics functioned no differently from agency employees who, although possessing less expertise, could have been tasked by the FAA's lawyers with preparing the same summaries. *See Rojas*, 927 F.3d at 1063 (Christen, J., concurring in part and dissenting in part). APTMetrics represented neither its own interests nor those of any other client in carrying out its work, and it did not share the documents with anyone outside the FAA's Office of the Chief Counsel, just as agency employees would have been expected to keep sensitive documents of this sort in-house. With respect to preparation of the summaries, then, APTMetrics was operating enough like the FAA's own

employees to justify calling its communications with the FAA "intra-agency." *See Klamath*, 532 U.S. at 12.[3]

## B

Because we conclude that the documents at issue qualify as intra-agency memorandums, we must next consider whether they satisfy Exemption 5's second requirement: that the documents "would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). This phrase has been construed to incorporate civil discovery privileges including, as relevant here, the attorney work-product privilege. *See Sears*, 421 U.S. at 148–49. After conducting our own *in camera* review of the documents at issue, we agree with the district court that two of the three documents listed in the *Vaughn* index are protected by the attorney work-product privilege and thus would not be subject to discovery in civil litigation with the FAA. However, a remand is necessary to determine whether the third document is also protected by the privilege.

A document is privileged as attorney work-product when it was prepared (1) "in anticipation of litigation or for trial," and (2) "by or for another party or by or for that other party's

---

[3] A different result might follow if the documents at issue had been the validation studies themselves. According to the FAA, APTMetrics performed the validation work in its capacity as an "outside expert" hired to provide independent validation of the 2015 biographical assessment. As APTMetrics' outsider status was essential to this work, APTMetrics could not have acted in a capacity equivalent to that of the FAA's own employees when it validated the test. Put differently, it is far from clear that an agency may tout the independent validation provided by "outside experts" and at the same time claim that those experts are "within" the agency for purposes of Exemption 5.

representative." *In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004).

As to the first requirement, the FAA's declarations adequately explained why two of the three documents were prepared in anticipation of litigation. In April 2014, an unsuccessful applicant for a position as an air traffic controller filed a complaint against the FAA on behalf of a class of other unsuccessful applicants. In November 2014, lawyers in the FAA's Office of the Chief Counsel asked APTMetrics to prepare "summaries and explanations" of the work it had done to validate the revised 2015 version of the biographical assessment. According to the declarations submitted by the FAA, APTMetrics sent its initial response to the Office of the Chief Counsel in December 2014 and followed up with a supplemental response in January 2015.

As Rojas notes, the April 2014 complaint challenged the FAA's use of the 2014 version of the biographical assessment, not the 2015 version of the test that is the subject of the documents at issue. But the FAA planned to use a revised version of the 2014 test to perform a similar screening function during the 2015 hiring cycle, so it was reasonable for the agency to anticipate litigation concerning use of the revised 2015 biographical assessment as well. The documents that APTMetrics sent to the Office of the Chief Counsel in December 2014 and January 2015 were prepared in anticipation of that litigation.

The FAA's declarations do not address the one remaining document, which is described in the *Vaughn* index as a document prepared by APTMetrics dated September 2, 2015. The declaration from the FAA's lawyer states that the Office of the Chief Counsel received responses to its request for summaries of APTMetrics' validation work in December 2014 and January 2015. It

makes no mention of a third document received at a later date.  Moreover, *in camera* review of the document suggests that it may have been drafted as a response to a request for information from an outside third party, rather than as an internal memorandum from APTMetrics to the FAA's lawyers.  As a result, on this record the FAA failed to carry its burden of establishing that this document was prepared in anticipation of litigation.

Rojas objects that, even if APTMetrics' December 2014 and January 2015 summaries qualify as attorney work-product, the firm did not conduct the underlying validation studies in anticipation of litigation.  But application of the attorney work-product privilege does not turn on whether the records underlying the summaries were created in anticipation of litigation.  What matters is that the summaries themselves were created in anticipation of litigation, since those are the documents the FAA seeks to withhold.

Regarding the privilege's second requirement, the December 2014 and January 2015 summaries were prepared for the FAA by APTMetrics.  The work-product privilege covers not only documents prepared by a party but also documents prepared by others acting on the party's behalf. *United States v. Nobles*, 422 U.S. 225, 238–39 & n.13 (1975); *see also* Fed. R. Civ. Proc. 26(b)(3)(A) (listing a party's "consultant" among those who may prepare a document subject to work-product protection).  That the summaries were prepared by APTMetrics on the FAA's behalf, rather than by the FAA itself, poses no barrier to application of the work-product privilege.

Because the December 2014 and January 2015 validation summaries are intra-agency memorandums that would be subject to the attorney work-product privilege in litigation with the FAA, the FAA properly withheld them

under Exemption 5.  We vacate the district court's entry of summary judgment for the FAA as to the third document, dated September 2, 2015, and remand for further proceedings with respect to that document.

III[4]

Rojas raises two arguments concerning the adequacy of the FAA's search for responsive documents.  We agree with the three-judge panel's unanimous resolution of both arguments.

First, Rojas contends that the FAA should have been required to search APTMetrics' records for documents responsive to his FOIA request, since such a search would undoubtedly have turned up the data underlying APTMetrics' validation work as well as the validation studies themselves, rather than just the summaries of those studies included in the FAA's *Vaughn* index.  Like the three-judge panel, we are sympathetic to Rojas's argument.  *See Rojas*, 927 F.3d at 1059.  It seems counterintuitive to hold that an outside consultant may be deemed "within" a federal agency for purposes of invoking Exemption 5, but that documents created by the consultant on the agency's behalf may be outside the scope of the search FOIA requires.  Nonetheless, existing Supreme Court precedent forecloses Rojas's contention.

FOIA authorizes a court to compel disclosure of "agency records."  5 U.S.C. § 552(a)(4)(B).  The Supreme Court has held that agency records must have been created or obtained by the agency and must be in the agency's control at the time

---

[4] Chief Judge Thomas and Judges Wardlaw, Rawlinson, M. Smith, Hurwitz, and Collins join in this part of the majority opinion.

the FOIA request is made. *Department of Justice v. Tax Analysts*, 492 U.S. 136, 144–45 (1989). Documents that are not in an agency's possession do not constitute "agency records" even if the agency could have obtained them by asking a third party to produce them. *Id.* at 144. Given this precedent, the FAA properly limited the scope of its search to records in the agency's possession; it had no obligation to search records in APTMetrics' possession.

Second, Rojas argues that the declarations submitted by the FAA fail to show that it "conducted a search reasonably calculated to uncover all relevant documents," as our cases require. *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985). To satisfy this requirement, the FAA's declarations had to be "nonconclusory" and "relatively detailed in their description of the files searched and the search procedures" followed. *Id.* at 573. But here, the FAA submitted just one declaration describing the scope of the search, and it stated only that the search conducted by the Office of the Chief Counsel "was reasonably calculated to obtain responsive records because the attorneys who provided legal advice related to the revisions to the [air traffic controller] hiring process were asked to review their records."

The FAA's declaration falls short of what our cases require because it offers no details about how the search was conducted. For example, it does not describe, even in general terms, the number of attorneys involved, the search methods they used, the body of records they examined, or the total time they spent on the search. *Cf. Lane v. Department of Interior*, 523 F.3d 1128, 1139 (9th Cir. 2008); *Citizens Commission on Human Rights v. FDA*, 45 F.3d 1325, 1328 (9th Cir. 1995). Without details such as these, we are in no position to conclude that the agency's search was reasonably calculated to locate all responsive records.

*See Steinberg v. Department of Justice*, 23 F.3d 548, 551–52 (D.C. Cir. 1994) (declaration found inadequate because it "fail[ed] to describe in any detail what records were searched, by whom, and through what process").

\*          \*          \*

We join six of our sister circuits in adopting the consultant corollary to Exemption 5, and we hold that the FAA properly withheld two of the three documents at issue here under that exemption. However, the FAA did not establish that the remaining document is protected by the attorney work-product privilege, and the agency failed to show that it conducted a search reasonably calculated to locate all documents responsive to Rojas's FOIA request. We vacate the district court's entry of summary judgment in the FAA's favor and remand for further proceedings consistent with this opinion.

Rojas's motion for judicial notice (Dkt. No. 7) is DENIED.

**AFFIRMED in part, VACATED in part, and REMANDED for further proceedings.**

The parties shall bear their own costs.

COLLINS, Circuit Judge, concurring:

I concur in the majority opinion, which adopts the reading of Exemption 5 endorsed by Justice Scalia (joined by two other Justices) in his dissenting opinion in *United States Department of Justice v. Julian*, 486 U.S. 1 (1988). Under that reading, Exemption 5's reference to "intra-

agency memorandums" extends to "one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity," such as a "consultant to the agency." *Id*. at 18 n.1 (Scalia, J., dissenting).[1]  I write separately to respond to the dissents' erroneous contentions that Justice Scalia's reading of Exemption 5 is "atextual," *see* Wardlaw Dissent at 33; that it "rewrites" Exemption 5, *see id*.; that it uses "legislative purpose to override statutory text," *see* Bumatay Dissent at 58; and that, ultimately, he (and we) "simply made it up," *id*. at 61.

# I

The relevant text of Exemption 5 states that FOIA's disclosure requirements do not apply to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The dissents assume that, by using the term "intra-agency," the statute is "crystal clear" in referring only to memoranda prepared by "'*employees* of a single agency,'" *see* Wardlaw Dissent at 35, 36 (emphasis added) (citation omitted), and "leave[s] no room for documents created by those outside of an

---

[1] In *Julian*, the Supreme Court held that, even assuming that the documents in question were "'inter-agency' records for purposes of Exemption 5," *see* 486 U.S. at 11 n.9, they were not exempt from disclosure because, at least as to the requesters in that case, the additional requirements of Exemption 5 were not met, *see id*. at 11–14.  Justice Scalia dissented from that latter holding, and as a result, his dissent had to address the issue of whether Exemption 5 was inapplicable on the alternative ground that the documents were "not 'inter-agency or intra-agency memorandums' within the meaning of Exemption 5."  *Id*. at 18 n.1 (Scalia, J., dissenting); *see also id*. at 11 n.9 (majority opinion) (majority did "not find it necessary" to reach this issue).

agency's *employment*," *see* Bumatay Dissent at 53 (emphasis added). But as Justice Scalia recognized, to the extent that this employment-based reading might seem to be the "most natural meaning of the phrase 'intra-agency memorandum,'" that is true only if one examines that phrase "*[a]part from its present context*." *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting) (emphasis added). Here, there are two features of the statutory text that, considered in context, point away from the dissents' narrow, employment-based reading of Exemption 5.

First, the dissents overlook the fact that the actual words of the statute require only that the "*memorandum*[]" be "intra-agency," not necessarily that the *authors and recipients* be formal *employees* of that agency. 5 U.S.C. § 552(b)(5) (emphasis added). As the Supreme Court recognized in *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001), this feature of the statutory language plainly *allows* for a reading under which "consultants may be enough like the agency's own personnel to justify calling their *communications* 'intra-agency.'" *Id*. at 12 (emphasis added).[2] Thus, while the Court in *Klamath* did not decide whether Justice Scalia's reading of Exemption 5 was correct, *see* 532 U.S. at 12 (specifically reserving the question), the Court recognized that, at the very least, Justice Scalia was right in contending that his view rested on a "*permissible* . . . reading of the statue," *Julian*, 486 U.S.

---

[2] The Supreme Court's apt phrasing of this alternative permissible reading refutes the dissents' strawman arguments that this construction rests either on a "geographical" or "location" condition, *see* Bumatay Dissent at 55 n.5, or on the view that any document in the agency's possession (from any source) is, without more, an "intra-agency" memorandum, *see* Wardlaw Dissent at 44–44. Nothing in Justice Scalia's dissent in *Julian*, or in the Supreme Court's description of his view in *Klamath*, adopts the dissents' caricatures.

at 18 n.1 (Scalia, J. dissenting) (emphasis added). As the *Klamath* Court explained, the reason why consultants might be enough like employees "to justify calling their communications 'intra-agency'" is that "the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it. Its only obligations are to truth and its sense of what good judgment calls for, and in those respects *the consultant functions just as an employee would be expected to do*." 532 U.S. at 11–12 (emphasis added).[3] Accordingly, the dissents' contention that the words of the statute "clearly" and "precisely" require authorship by a formal *employee*—as opposed to someone acting in some *other* "governmentally conferred capacity," *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting)—is simply incorrect. *See* Wardlaw Dissent at 35–35; Bumatay Dissent at 35–36.[4]

Second, the dissents overlook the remainder of the statutory language in Exemption 5, which further elucidates the types of documents protected by that provision. The intra-agency memorandums covered by Exemption 5 are those "that would not be available by law to a party other than an agency *in litigation with the agency*." 5 U.S.C. § 552(b)(5) (emphasis added). As the text suggests, this

---

[3] By contrast, *Klamath* held that the same was not true with respect to a self-interested party who communicates with an agency to further its own, independent interests, and such a party's communications with the agency thus could not be said to be "intra-agency." 532 U.S. at 12–13.

[4] For the same reason, Judge Bumatay is wrong in suggesting that it is "not clear how else Congress could have expressed its rejection" of Justice Scalia's view. *See* Bumatay Dissent at 60. Had Congress wanted to limit the excluded memoranda to only those authored by agency "employees," it could certainly have added language specifically stating that.

language "simply incorporates civil discovery privileges." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975) ("It is equally clear that Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5[.]"). Consequently, in determining whether a *communication* is within the agency for purposes of Exemption 5, it makes sense to consider whether the communication to the agency is from a person whose "governmentally conferred capacity," *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting), is one that can bring it *within the agency's litigation privileges*. On that score, it is highly relevant that "there is no question that litigants need not produce materials covered by the attorney-client privilege or documents that constitute attorney work-product, *including those prepared by the party's agents and consultants*." *Rojas v. FAA*, 927 F.3d 1046, 1062 (9th Cir. 2019) (Christen, J., concurring in part and dissenting in part) (emphasis added) (collecting cases).[5]

The dissents nonetheless argue that Exemption 5 should be restricted to employee-authored memoranda because, unlike Exemptions 4 and 8, the text of Exemption 5 does not expressly refer to documents from non-employees. *See* Wardlaw Dissent at 35–36; Bumatay Dissent at 58 n.6. But it is of no relevance that the very different categories of documents covered by Exemption 4, 5 U.S.C. § 552(b)(4) ("trade secrets and commercial or financial information

---

[5] Contrary to what the dissents suggest, this does not mean that the term "'intra-agency' does no work at all." *See* Bumatay Dissent at 55 n.5; *see also* Wardlaw Dissent at 44. It simply means that, in choosing between two permissible readings of "intra-agency," one should not lose sight of the *entirety* of the statutory language and what it reveals about the statute's purpose.

obtained from a person and privileged or confidential"), and Exemption 8, *id*. § 552(b)(8) (matters "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions"), use language that includes various types of documents created by persons that everyone would agree are outsiders. Exemption 5 does not follow the same approach and therefore would not be expected to use similar language. It instead applies to "intra-agency memorandums," and the question here is what communications by whom and for what purpose count as such. Put another way, the fact that Exemption 5 does not broadly sweep in certain categories of outsider-created documents does not somehow mean that *only employee*-authored documents count as "intra-agency" documents. Because the wording and aim of the provisions are so different, this is not a situation in which Congress otherwise used very similar language in multiple different provisions, but then chose to omit a particular term in one of those multiple instances. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983). Here, the wording of the three exemptions is so completely dissimilar that the comparative inference the dissents try to draw is unwarranted.

The dissents are thus wrong in contending that Exemption 5's reference to "intra-agency memorandums" excludes, as a textual matter, the broader reading of Exemption 5 adopted by Justice Scalia in *Julian*.

## II

Moreover, as Justice Scalia also recognized, his refusal to read Exemption 5 as limited to employee-authored documents is not only a "permissible" reading but a "desirable" one. *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting). Limiting the provision to only those documents

authored by formal employees "excludes many situations where Exemption 5's purpose of protecting the Government's deliberative process is plainly applicable." *Id*. It is therefore "textually possible and much more in accord with the purpose of the provision, to regard as an intra-agency memorandum one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency." *Id*. And in the case before us, as in *Julian*, "[h]ere we have . . . memorand[a] that fit[] readily within this definition." *Id*.

The dissents contend that this consideration of the "purpose" of Exemption 5 disregards "the textualist revolution," *see* Wardlaw Dissent at 38, and amounts to an "'escape route from the prison of the text,'" *see* Bumatay Dissent at 54 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 19 (2012) ("Reading Law")). These charges are unfounded, as is the contention that Justice Scalia in *Julian* betrayed the very "principles that [he] spent a lifetime advocating," *see id*. at 12.

The "fair reading" method of textualism that Justice Scalia endorsed "requires an ability to comprehend the *purpose* of the text, which is a vital part of its context." Reading Law, *supra*, at 33. "But the purpose is to be gathered *only* from the text itself, consistently with the other aspects of its context." *Id*. (emphasis added). Here, of course, the purpose of Exemption 5 to protect the Government's litigation privileges is express on the face of the statute itself, which explicitly describes the exemption in terms of when a document "would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). It is no lapse into purposivism to insist that, in

choosing among the permissible readings that the text will bear, a "textually permissible interpretation that furthers rather than obstructs the [statute's] purpose should be favored." Reading Law, *supra*, at 63. The dissents' employment-based reading of "intra-agency memorandums" would plainly obstruct Exemption 5's purpose to protect the Government's litigation privileges, and because there is a permissible reading of the text that avoids this outcome, it is to be preferred.[6]

Neither dissent seriously disputes that the employee-only reading of Exemption 5 would impede its express purpose by, for example, requiring disclosure of attorney-client communications with any outside counsel. Judge Bumatay instead sidesteps the problem by noting that attorney-client materials are not at issue on the particular facts of this case and that the FAA presumably does not rely on outside counsel. *See* Bumatay Dissent at 62–63. But FOIA has a wide reach, and there are entities (such as, for example, the FDIC) that count as "agencies" for purposes of FOIA and that use outside counsel frequently enough to have

---

[6] Judge Bumatay is also wide of the mark in chastising the majority for supposedly "rel[ying] on legislative history to determine Congress's purpose in enacting FOIA exemptions." *See* Bumatay Dissent at 59. The referenced portion of the majority opinion quotes a Supreme Court case identifying the "purpose" of Exemption 5 based on *the Supreme Court's* reliance on legislative history. *See* Maj. Opin. at 13–14 (quoting *Sears*, 421 U.S. at 150). I share Justice Scalia's criticism of the use of legislative history, but as a judge of an "inferior Court[]" to the "one supreme Court," *see* U.S. Const. art. III, § 1, I cannot fault the majority for faithfully following controlling Supreme Court precedent telling us what the purpose of Exemption 5 is, even if that precedent relies on legislative history. And, as I have explained, the text of Exemption 5 itself amply confirms the Supreme Court's point in *Sears* that Exemption 5's purpose is to protect confidential communications protected by "civil discovery privileges." *See* Maj. Opin. at 13.

written guidelines on the subject.  *See* FDIC, "Information for Prospective Outside Counsel," <https://www.fdic.gov/buying/legal/ocbrochure/information-for-prospective-outside-counsel.pdf>.[7]

Judge Wardlaw, by contrast, does not avoid the implications of the employee-only reading of Exemption 5. Instead, to the extent that this reading would allow FOIA to vitiate "even attorney-client materials," Judge Wardlaw views that as simply the price to pay to "ensure[] that the workings of the Executive Branch are transparent to the American people."  *See* Wardlaw Dissent at 44–46.  Indeed, Judge Wardlaw erroneously disregards the purpose of Exemption 5 altogether, treating it as always subordinate to FOIA's overarching aim of disclosure—so much so that, under her view, we must adopt *any* pro-disclosure reading of the text, apparently without regard to any other textual canons.  *See id*. at 41.  This flawed analysis overlooks the fact that FOIA's "exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement."  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (simplified); *see also* Reading Law, *supra*, at 168 ("[L]imitations on a statute's reach are as much a part of the statutory purpose as specifications of what is to be done.").  And here, of course, it is the text of an *exemption* that is at issue.

---

[7] Judge Bumatay suggests that the implications of his position may not be as ominous as they seem for such agencies, because he speculates that maybe all of their outside counsel are actually formally designated as "special Government employees."  *See* Bumatay Dissent at 63 n.9. However, he cites nothing to support this speculation, which seems at odds with the FDIC's outside-counsel handbook as well as with the applicable FDIC regulations, which designate them as "contractors."  *See* 12 C.F.R. pt. 366.

## III

Because Justice Scalia's reading of Exemption 5 is both "textually possible and much more in accord with the purpose of the provision," *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting), I agree with the majority's endorsement of that reading. And the dissents are thus wrong in insisting that the statutory text *requires* this court to create a 6–1 circuit split by jettisoning 50 years of settled case law that Congress has never seen fit to reject.[8] *Cf. Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988) ("Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation." (simplified)).

---

[8] Judge Wardlaw wrongly contends that the Sixth Circuit in *Lucaj v. FBI*, 852 F.3d 541 (6th Cir. 2017), "cast serious doubt on whether the consultant corollary can be found in Exemption 5's text." *See* Wardlaw Dissent at 39. The target of the Sixth Circuit's criticism was the distinct (and much broader) "common-interest doctrine," on which the FBI had relied in that case. 852 F.3d at 547–48. In rejecting the FBI's contention, the Sixth Circuit reasoned that "when the Department of the Interior made the same argument in *Klamath*, the Supreme Court rejected it." *Id.* at 548. Given that the Supreme Court in *Klamath* expressly *declined* to reject the so-called "consultant corollary," the "same argument" that was rejected by both the Sixth Circuit and the Supreme Court cannot have been *that* doctrine. Rather, as the Sixth Circuit explained, it and the Supreme Court rejected the view "'that "intra-agency" is a purely conclusory term, just a label to be placed on any document the Government would find it valuable to keep confidential'"—which is a fair description of the *common-interest doctrine*. *Id.* (quoting *Klamath*, 532 U.S. at 12). As a result, with today's en banc decision, there is now no circuit split on the "consultant corollary."

WARDLAW, Circuit Judge, with whom THOMAS, Chief Judge, and HURWITZ, Circuit Judge, join, concurring in part and dissenting in part:

Less than two years ago, the Supreme Court reemphasized that federal courts must interpret and apply FOIA in accordance with that statute's plain text and structure. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362–63 (2019). That lesson rings particularly true when, as here, FOIA's plain text aligns with FOIA's presumption of government transparency. *See Milner v. Dep't of Navy*, 562 U.S. 562, 571 (2011). But today, the majority ignores these principles, embraces an atextual "consultant corollary" doctrine, and, in doing so, rewrites FOIA Exemption 5. For these reasons, I respectfully dissent.[1]

## I.

FOIA grants the public a qualified statutory right of access to federal agency "records." *See* 5 U.S.C. § 552(a)(3)(A), (b). Thus, when a member of the public "requests" records from an agency, the agency must disclose those records "unless they fall within one of nine exemptions." *Milner*, 562 U.S. at 565.

Exemption 5, at issue here, shields from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). By its plain terms then, this exemption applies only if the "communication" being sought is "inter-agency or intra-agency." *Dep't of Interior v. Klamath Waters Users*

---

[1] Because I agree with the majority that the FAA's search for records was inadequate, I join part III of the majority opinion.

*Protective Ass'n*, 532 U.S. 1, 9 (2001).  The majority rightly acknowledges that the documents sought here are not "inter-agency" because APTMetrics—the outside consulting firm that prepared these documents—is "not a federal agency in its own right."  Maj. Op. at 12.  Thus, this case hangs on whether the documents APTMetrics prepared and transmitted to the FAA count as "intra-agency" memorandums or letters."

In answering that question, the "proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Argus Leader*, 139 S. Ct. at 2364.  We therefore turn to FOIA's text.  FOIA itself defines the term "agency."    5  U.S.C.  §§ 551(1),  552(f).    "With exceptions not relevant here," that word "means 'each authority of the Government of the United States,' and 'includes any executive department, military department, Government    corporation,    Government    controlled corporation, or other establishment in the executive branch of the Government . . . , or any independent regulatory agency.'"    *Klamath*, 532 U.S. at 9 (quoting 5 U.S.C. §§ 551(1), 552(f)).  Nothing in this definition provides a textual hook for thinking of outside contractors as part of a federal agency.

As for "intra," FOIA nowhere defines that term.  "So, as usual" and as with other "undefined terms in FOIA[,]" we look to this term's "ordinary, contemporary, common meaning [] when Congress enacted FOIA in 1966." *Argus Leader*, 139 S. Ct. at 2362 (internal quotation marks and citations omitted).  Much as it does now, the term "intra" then meant "in" or "within," *Black's Law Dictionary* 957 (Rev. 4th Ed. 1968); *Webster's Seventh New Collegiate Dictionary* 444 (1961), or perhaps "in the interior," *Webster's Second New Int'l Dictionary of the Eng.*

*Language* 1302 (1959). Coupled with FOIA's definition of "agency," the term "intra-agency" clearly signals the idea of being "in" or "within" a federal agency. The question then becomes what Congress meant when it joined that understanding of "intra-agency" to the words "memorandums or letters."

In this regard, the Supreme Court has acknowledged that "the most natural meaning of the phrase 'intra-agency memorandum' is a memorandum that is addressed both to and from employees of a single agency." *Klamath*, 532 U.S. at 9 (internal quotation marks and citation omitted). In other words, intra-agency memorandums and letters are circulated within—and only within—an agency. This makes good sense, for "[n]either the terms of [Exemption 5] nor the statutory definitions say anything about communications with outsiders." *Id.*; *see also* John C. Brinkerhoff Jr., *FOIA's Common Law*, 36 Yale J. on Reg. 575, 583 (2019) ("It is doubtful that any reasonable reading of 'inter-agency or intra-agency' could encompass third parties.").

Exemption 5's silence on communications and documents from outsiders is especially notable because other FOIA exemptions explicitly include such communications and documents. Exemptions 4 and 8 expressly encompass information generated outside of a federal agency. *See* 5 U.S.C. § 552(b)(4) (permitting the withholding of "trade secrets and commercial or financial information *obtained from a person* and privileged or confidential" (emphasis added)); *id.* § 552(b)(8) (shielding from disclosure information "contained in or related to examination, operating, or condition reports prepared by, *on behalf of, or for the use of an agency* responsible for the regulation or supervision of financial institutions" (emphasis added)). Congress thus knew how to specify that FOIA

exemptions cover documents from outside third parties, and it did so in these other exemptions. *See Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015). That Exemptions 4 and 8 explicitly speak to this issue—but Exemption 5 does not—makes clear that Exemption 5 applies only to records that originate and remain inside the federal government.

What's more, reading "intra-agency memorandums or letters" to cover the exchange of documents within a federal agency runs parallel to the judicial interpretation of "inter-agency . . . memorandums or letters." With the word "inter-agency," "Congress plainly intended to permit one agency possessing decisional authority to obtain written recommendations and advice from a separate agency not possessing such decisional authority without requiring that the advice be any more disclosable than similar advice received from within the agency." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975). Congress thus permitted the withholding of memorandums or letters exchanged "between" agencies, just as its use of the word "intra-agency" allows for the withholding of memorandums or letters exchanged "within" agencies.

In short, Exemption 5's text is crystal clear: documents or communications exchanged with *outside* consultants do not fall within that exemption. For "outside consultants" are, by definition, not "within" a federal agency. They are independent contractors, hired to assist an agency with a finite task that the agency has decided to outsource. Indeed, APTMetrics and its employees may have worked alongside the FAA's employees in this case, but it and its employees are not an arm of the Executive Branch. Our judicial inquiry should thus be at an end. *Argus Leader*, 139 S. Ct. at 2364.

## II.

"So where *did* the [consultant corollary] come from?" *Id.* (emphasis in original). The answer is a piece of untethered dicta (Footnote 44 to be exact) in a D.C. Circuit case from the early 1970's. *See Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971). Footnote 44 spoke into existence the consultant corollary without examining either Exemption 5's text or FOIA's overarching structure.[2] The *Soucie* court instead sought to discern Congress's purpose in enacting Exemption 5, and then considered what other situations not covered by Exemption 5's text could benefit from a similar rationale. Yet, as we all know by now, such an "approach is a relic from a bygone era of statutory construction." *Argus Leader*, 139 S. Ct. at 2364 (internal quotation marks and citation omitted).

Still, "judicial inertia" proved a powerful thing. *Rojas v. Fed. Aviation Admin.*, 927 F.3d 1046, 1057 (9th Cir. 2019), *reh'g en banc granted*. What *Soucie*'s Footnote 44 set in motion, the Fifth Circuit continued in *Wu v. National Endowment for Humanities*, 460 F.2d 1030 (5th Cir. 1972). Again, that court did not bother to confront Exemption 5's text or FOIA's structure. *Id.* at 1032. It simply quoted *Soucie* and moved along. *Id.* The First and Second Circuits soon fell in line, relying on *Soucie*, *Wu*, and later Fifth

---

[2] Footnote 44 states: "The rationale of the exemption for internal communications indicates that the exemption should be available in connection with the Garwin Report even if it was prepared for an agency by outside experts. The Government may have a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity. A document like the Garwin Report should therefore be treated as an intra-agency memorandum of the agency which solicited it." *Soucie*, 448 F.2d at 1078 n.44.

Circuit cases that cited *Wu* rather than conducting any sort of textual or structural analysis for themselves. *See Gov't Land Bank v. Gen. Servs. Admin.*, 671 F.2d 663, 665 (1st Cir. 1982); *Lead Indus. Ass'n, Inc. v. OSHA*, 610 F. 2d 70, 83 (2d Cir. 1979). Meanwhile, the D.C. Circuit paid lip service to Exemption 5's text in *Ryan v. Department of Justice*, 617 F.2d 781 (D.C. Cir. 1980), but interpreted that text "in light of [Exemption 5's] purpose," *id.* at 789, which it divined from legislative history, and the judicial "common sense" espoused in *Wu* and *Soucie*, *id.* at 790 & n.30; *see also* Brinkerhoff, *supra*, at 614 ("[O]nce a court made an initial interpretation, others could simply cite that decision rather than re-explain the tensions between FOIA's text and diverging doctrine.").

The Supreme Court watched these developments from a distance. In 1988, in the early days of the textualist revolution, three dissenting justices suggested in a footnote without much analysis that the consultant corollary doctrine, though not the "most natural meaning" of Exemption 5, was "a permissible and desirable reading of the statute." *U.S. Dep't of Just. v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting). Those justices did not, however, explain why this meaning was "textually possible," what "the purpose of" Exemption 5 was, or why that purpose should trump the exemption's plain text. *Id.*

Thirteen years later in *Klamath*, a unanimous Court brought this debate into somewhat sharper focus. On the one hand, it acknowledged that "neither the terms of [Exemption 5] nor the statutory definitions say anything about communications with outsiders." *Klamath*, 532 U.S. at 9. It further affirmed that the words "inter-agency or intra-agency" in Exemption 5 are not "purely conclusory term[s]" and that there exists no "textual justification for draining the

[inter-agency or intra-agency requirement] of independent vitality." *Id.* at 12. On the other hand, the Court quoted the footnote in Justice Scalia's *Julian* dissent to highlight the previously advanced argument in favor of the consultant corollary doctrine. *See id.* at 9–10. But the Court had no occasion to settle this controversy in *Klamath*, *see id.* at 12, and resolved that case on other grounds, *see id.* at 12–15.

The debate surrounding the consultant corollary doctrine and its variants has remained unsettled in the wake of *Klamath*. One court of appeals has fallen in line with the *Soucie* consensus, though based on a clear misreading of *Klamath*. *See Stewart v. U.S. Dep't of Interior*, 554 F.3d 1236, 1244 (10th Cir. 2009) (stating incorrectly that *Klamath* had definitively "recogniz[ed] that Exemption 5 extends to government agency communications with paid consultants"). Another applied the doctrine without analyzing *Klamath* at all, *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 291–94 (4th Cir. 2004), and, over a dissent, has since extended Exemption 5 even further, far beyond the bounds of the consultant corollary, *Hunton & Williams v. U.S. Dep't of Just.*, 590 F.3d 272, 279–80 (4th Cir. 2010). Only the Sixth Circuit has bucked the *Soucie* trend and, at the least, cast serious doubt on whether the consultant corollary can be found in Exemption 5's text. *See Lucaj v. Fed. Bureau of Invest.*, 852 F.3d 541, 548–49 (6th Cir. 2017) (refusing to read Exemption 5's plain text to embrace the common interest doctrine and implying that the consultant corollary suffers from similar defects). Meanwhile, even within circuits that have embraced the consultant corollary, there remain clear misgivings. *See, e.g.*, *Nat'l Inst. of Military Just. v. Dep't of Def.*, No. 06-5242, 2008 WL 1990366, at *1 (D.C. Cir. April 30, 2008) (Tatel, J., concurring in the denial of rehearing en banc) ("I continue to believe that the documents at issue here fall

outside the protection of Exemption 5 of the Freedom of Information Act because they cannot plausibly be described as 'intra-agency' . . . .").

If you expected a long and storied history of careful analysis and reasoning to lie behind the consultant corollary, you probably feel disappointed. Readers familiar with FOIA might even feel a sense of *déjà vu* in all this. As in *Milner* and *Argus Leader*, a decades-old D.C. Circuit decision that contained no meaningful analysis of FOIA's text gave birth to an atextual doctrine. And as in those cases, other circuits followed the D.C. Circuit's lead without meaningful analysis of the text or structure of Exemption 5. We can only speculate as to where this will end.

## III.

To its credit, the majority opinion acknowledges that adopting the consultant corollary is not the most natural reading of Exemption 5. Maj. Op. at 12. Its analysis laudably does more than blindly cite to *Soucie*, *Wu*, or their progeny. However, it can only adopt the consultant corollary by distorting Exemption 5's context and legislative purpose. Maj. Op. at 13. None of this analysis was necessary given Exemption 5's plain text, and perhaps worse, none of it holds up to careful scrutiny.

On every level, FOIA's statutory context cuts against the consultant corollary. At the highest level, "disclosure, not secrecy, is the dominant objective of" FOIA, *Klamath*, 532 U.S. at 8, and "Congress undoubtedly sought to expand public rights of access to Government information" through this Act, *Forsham v. Harris*, 445 U.S. 169, 178 (1980). The statute thus contains multiple different mechanisms to facilitate government transparency. *See* 5 U.S.C. § 552(a)(1)–(3), (5). "This pro-disclosure framework is

deliberate" and embodies "the power of frustration reflected in congressional distrust for agency withholding[,]" Brinkerhoff, *supra*, at 577 (internal quotation marks and citation omitted), which stemmed from the litany of government abuses before FOIA and the Watergate scandal, *see* 1 O'Reilly, *Fed. Info. Disclosure* §§ 2:2, 3:8 (2018).

Zooming in to focus on the context of FOIA's exemptions is similarly unhelpful to the majority's cause. These nine limited exemptions are "explicitly made exclusive and must be narrowly construed." *Milner*, 562 U.S. at 564 (internal quotation marks and citations omitted); *see also* 5 U.S.C. § 552(d). Therefore, even if there are two equally plausible readings of a given FOIA exemption, we must favor the one that promotes government transparency—not secrecy. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 366 (1976) ("FOIA requires us to choose that interpretation most favoring disclosure."); *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 164 (1989) (Scalia, J., dissenting) ("[O]ur doctrine of 'narrowly construing' FOIA exemptions requires that ambiguity to be resolved in favor of disclosure.").

If anything, then, statutory context dooms the majority's reading of Exemption 5. Although the plain text of the word "intra-agency" should alone resolve this case, the majority (wrongly) views this word as having two equally plausible interpretations. Maj. Op. at 13. One interpretation reads Exemption 5 narrowly, rejects the consultant corollary, and thus favors disclosure; the other does the exact opposite. That dichotomy should make our job easy. Because the tie goes to disclosure, so to speak, we should side with the narrow interpretation of "intra-agency" and refuse to adopt the consultant corollary. *See Rose*, 425 U.S. at 366.

Instead, the majority's "tiebreaker" is a myopic reading of the purposes behind Exemption 5. To be sure, that exemption reflects a justifiable policy concern with protecting an agency's internal deliberations and preventing the disclosure of certain privileged documents. *See Klamath*, 532 U.S. at 8–9; *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 801 (1984). But "the point" of Exemption 5 "is not to protect Government secrecy pure and simple," and thus "the first condition of Exemption 5 is no less important than the second; the communication must be 'inter-agency or intra-agency.'" *Klamath*, 532 U.S. at 9; Brinkerhoff, *supra*, at 584 (explaining that Congress did not transfer the privileges existing prior to FOIA's enactment to Exemption 5 "unscathed"). In other words, Exemption 5 protects from disclosure only *certain* privileged agency documents—*i.e.*, those that are inter- or intra-agency.

In this respect, it is notable that the cases from which the majority surmises the purpose of Exemption 5 all predate *Klamath*. Maj. Op. at 13–14. Before *Klamath*, the Supreme Court's Exemption 5 cases had addressed only half of the Exemption 5 inquiry. *See* 532 U.S. at 8 ("Our prior cases on Exemption 5 have addressed the second condition, incorporating civil discovery privileges."). *Klamath* thus marked the first time that the Supreme Court addressed the full purpose of Exemption 5, and the Court there specifically warned against draining Exemption 5's "intra-agency or inter-agency" requirement of "independent vitality." *Id.* at 12.

That Congress intended Exemption 5 to protect less than the full universe of privileged government documents is also far from surprising. Early drafts of FOIA immunized even fewer of these documents from disclosure. They shielded only "agency internal memoranda used in disposing of

adjudicatory or rulemaking matters[,]" and refused to protect even "routine internal agency correspondence." 1 O'Reilly, *Fed. Info. Disclosure* § 2:3. Of course, the Executive Branch balked at this language, and a compromise was ultimately reached. *See id.* § 15:2. Together, the political branches drew a new line at "intra-agency or interagency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5); *see also* 1 O'Reilly, *Fed. Info. Disclosure* § 15:2. The release of some privileged documents through FOIA is thus by no means the aberration the majority suggests, but a long-planned feature of FOIA. *See Klamath*, 532 U.S. at 16 ("Congress had to realize that not every secret under the old law would be secret under the new.").

Judge Collins's concurrence makes a similar misstep, though he frames this argument as a contextual reading of the word "intra-agency" rather than one based on legislative purpose. Collins Concurrence at 26–27. However, as already explained, that Exemption 5's text envisions protecting *some* privileged documents from disclosure by no means signals that Congress intended to withhold from scrutiny *all* such documents. *Cf. Klamath*, 532 U.S. at 11–12 ("From the recognition of this interest in frank communication, which the deliberative process privilege might protect, the Department would have us infer a sufficient justification for applying Exemption 5 to communications with the Tribes, . . . But the Department's argument skips a necessary step, for it ignores the first condition of Exemption 5, that the communication be 'intra-agency or inter-agency.'"); *id.* at 16 ("FOIA's mandate of broad disclosure . . . was obviously expected and intended to affect Government operations.").

Finally, as already explained, Exemption 5's use of the word "intra-agency" does not protect just any memorandum or letter within an agency, regardless of whether its authors and recipients were agency employees. Collins Concurrence at 24. But two additional points are worth emphasizing. First, such a reading would render the term "intra-agency . . . purely conclusory" and without "independent vitality," *id.* at 32, for every document potentially subject to a FOIA request is "within" an agency, *see U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142, 144–46 (1989). Second, that reading would also cause courts to read Exemption 5's parallel terms "intra-agency" and "inter-agency" in asymmetric ways. Intra-agency memorandums or letters would merely need to be physically (or digitally) within an agency, while inter-agency memorandums or letters would need to have been exchanged between agencies. Reading these terms, located in the same sentence, to diverge in such a manner runs counter to a faithful interpretation of FOIA's text. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated.").

## IV.

All that remains at this point is a consequentialist argument based on a fear of the quantity and types of government documents that may enter the public domain if we take Congress at its word in Exemption 5. As judges, we are former lawyers, and it is only natural that our instincts lead us away from the possibility that Congress authorized the disclosure of sensitive documents—for instance, attorney work-product or even attorney-client materials. *See* Maj. Op. at 15. And to be sure, Exemption 5, like all FOIA exemptions, plays an important role in FOIA's statutory scheme. *See Argus Leader*, 139 S. Ct. at 2366; Collins

Concurrence at 31. But, we must respect the statutory scheme that Congress created and read Exemption 5 as Congress wrote it; we cannot "tak[e] a red pen to the statute" and "cut[] out some words and past[e] in others." *Milner*, 562 U.S. at 573 (internal quotation marks and citation omitted); *see also Argus Leader*, 139 S. Ct. at 2366 ("[W]e cannot properly *expand* Exemption 4 beyond what its terms permit[;] we cannot arbitrarily *constrict* it either."). Indeed, "[b]y suggesting that our interpretation of Acts of Congress adopted [five decades] ago should be inflected based on the costs of enforcing them today, the [majority] tips its hand." *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2481 (2020).

Besides, "dire warnings are just that, and not a license for us to disregard the law." *Id.* If Congress has had a change of heart, it can always amend FOIA, which it has proven itself more than willing to do. *See, e.g.*, OPEN FOIA Act of 2009, Pub L. No. 111-83, § 564, 123 Stat. 2142, 2184 (2009); Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, 110 Stat. 3048 (1996). Congress has amended FOIA in the wake of judicial rulings it does not like, *see* 1 O'Reilly, *Federal Information Disclosure* § 3:9, and has even "amended FOIA when it wanted to stop the use of FOIA as an end run around discovery," Brinkerhoff, *supra*, at 595 n.154 (collecting sources discussing Congress's "1987 amendments to Exemption 7" stemming from "a gang member's use of FOIA to discover law enforcement information").

And, should Congress allow an honest reading of Exemption 5's text to stand, pessimism need not rule the day. "In FOIA, after all, a new conception of Government conduct was enacted into law, a general philosophy of full agency disclosure." *Klamath*, 532 U.S. at 16 (internal quotation marks and citation omitted). "Congress believed

that this philosophy, put into practice, would help 'ensure an informed citizenry, vital to the functioning of a democratic society.'"  *'Tax Analysts*, 492 U.S. at 142 (1989) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)).  Giving Exemption 5 its fair compass, and nothing more, lives up to these ideals, and ensures that the workings of the Executive Branch are transparent to the American people.

## V.

Like so many other courts of appeals, today our court disregards the plain text of Exemption 5 and continues a long history of judicial deference to Executive secrecy.  Because I disagree with that approach and do not think we should perpetuate this interpretation of Exemption 5, I respectfully dissent.

THOMAS, Chief Judge, concurring in part and dissenting in part:

I join Judge Wardlaw's dissent in full.  I also agree with the majority opinion's holding that the Federal Aviation Administration ("FAA") did not meet its burden to show that it conducted an adequate search for documents responsive to Jorge Rojas's Freedom of Information Act ("FOIA") request.  I write separately to observe that, even if the consultant corollary formed part of Exemption 5, it would not protect the specific information sought in this case.

Rojas's FOIA request was for "information regarding the empirical validation" of the FAA's 2015 "biographical assessment[.]"  These types of validation studies are addressed in the United States Equal Employment

Opportunity Commission's Uniform Guidelines on Employee Selection Procedures. *See generally* 29 C.F.R. pt. 1607. The Uniform Guidelines require that any employment screening test that results in adverse impact on members of any race, sex, or ethnic group must be validated by study, and the Uniform Guidelines establish detailed criteria for such validation studies. 29 C.F.R. §§ 1607.3(A), 1607.5.

Most importantly for our purposes, the Uniform Guidelines require employers and agencies to maintain documentation of the validation studies and make the studies available for review. Specifically, the Uniform Guidelines provide that "[a]ny employer . . . which uses a selection procedure as a basis for any employment decision" "should maintain and have available" documentation of the selection procedure's adverse impact, if any, and evidence of its validity. 29 C.F.R. §§ 1607.5(D), 1607.15, 1607.16(W).

The FAA has recognized its obligation under the Uniform Guidelines to conduct validation studies and maintain them. Indeed, the FAA's Deputy Assistant Administrator for Human Resource Management testified before Congress that compliance with the Uniform Guidelines "is legally an obligation we have as an agency," and that the FAA's consultants accordingly had "done the validation work to ensure that the [biographical assessment] is valid." *A Review of the Federal Aviation Administration's Air Traffic Controller Hiring, Staffing, and Training Plans: Hearing Before the Subcomm. on Aviation of the H. Comm. on Transp. & Infrastructure*, 114th Cong. 21 (2016). Further, the FAA has repeatedly confirmed that both the 2014 and 2015 biographical assessments had been validated. A document that an agency is required to produce and maintain is not a document prepared in anticipation of litigation. *See Am. Civ. Liberties Union of N. Cal. v. U.S.*

*Dep't of Just.*, 880 F.3d 473, 485–86 (9th Cir. 2018). Thus, Exemption 5 cannot shield the validation studies from disclosure under FOIA.

In this case, the record indicates that the FAA has either conducted an inadequate search for documents it actually possesses or has disregarded the Uniform Guidelines' instructions to "maintain and have available" evidence of the biographical assessment's validation by leaving it in APTMetrics' possession and attempting to shield it from disclosure under FOIA. 29 C.F.R. §§ 1607.5(D), 1607.15. An agency cannot avoid its responsibility to conduct and maintain employment screening test validation studies by placing the studies in third-party hands and claiming that the studies were prepared in anticipation of litigation. Such a practice would violate the Uniform Guidelines and frustrate FOIA's "policy of broad disclosure of Government documents[.]" *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 621 (1982).

Of course, the present record is not fully developed on these issues, and the instant appeal is limited to summaries of the studies, but the district court will have the opportunity to revisit these issues on remand.

In sum, I agree with Judge Wardlaw that FOIA's Exemption 5 does not afford "consultant corollary" protection for documents exchanged with a non-governmental entity. However, even if the consultant corollary could be grafted onto Exemption 5, it would not protect the information Rojas sought in his FOIA request because the information was required to be maintained and made publicly available by the agency.

Therefore, I respectfully concur in part and dissent in part.

IKUTA, Circuit Judge, with whom GRABER and CALLAHAN, Circuit Judges, join, and BUMATAY, Circuit Judge, joins except as to footnote 1, dissenting in part:

I write separately because I disagree with the majority's conclusion that the declaration submitted by the FAA failed to show that the agency "conducted a search reasonably calculated to uncover all relevant documents" in response to Rojas's FOIA request. *Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985) (cleaned up).[1]

"In response to a FOIA request, government agencies must conduct a reasonable search to find any documents responsive to the request." *Hamdan v. Dep't of Justice*, 797 F.3d 759, 770 (9th Cir. 2015). A search is reasonable if it is "reasonably calculated to uncover all relevant documents." *Zemansky*, 767 F.2d at 571 (citation omitted). "An agency can demonstrate the adequacy of its search through 'reasonably detailed, nonconclusory affidavits submitted in good faith.'" *Hamdan*, 797 F.3d at 770 (quoting *Zemansky*, 767 F.2d at 571). "Affidavits submitted by an agency to demonstrate the adequacy of its response are presumed to be in good faith." *Id*. In short, our standard requires the agency to make a "reasonable search" in light of the FOIA request at issue. *See id.*

Here, Rojas's FOIA request was limited to the following:

---

[1] I otherwise agree with the majority's interpretation of "intra-agency memorandums or letters" to include documents prepared by outside consultants hired by the agency to assist in carrying out the agency's functions. Therefore, I would affirm the district court's summary judgment order for the FAA as to the first two withheld documents, and reverse as to the third document for the reasons stated in the majority opinion.

I am requesting information regarding the empirical validation of the biographical assessment noted in the rejection notification. This includes any report created by, given to, or regarding APTMetrics' evaluation and creation and scoring of the assessment.

Only the search undertaken by the FAA's Office of the Chief Counsel is at issue in this appeal. The Office of Chief Counsel's involvement in the Air Traffic Control Specialists (ATCS) hiring process was limited to requesting and obtaining a summary of APTMetrics' "validation work related to the use of the [Biographical Assessment] as an instrument in the ATCS selection process," in connection with potential future litigation. This assignment to APTMetrics was narrowly focused: According to the FAA's *Vaughn* index, only three documents related to this assignment were found in the FAA's legal office.

Given this context, asking the lawyers in the office who had been assigned to provide legal advice regarding the revisions to the ATCS hiring process to search their files for responsive documents would be a reasonable response to Rojas's FOIA request.

And that was exactly what the Office of the Chief Counsel did. Yvette Armstead, the Assistant Chief Counsel at the Office of the Chief Counsel's Employment and Labor Law Division (AGC-100), is the lawyer responsible for providing "legal advice related to the hiring process for [ATCS] at the Federal Aviation Administration." According to her declaration, which we presume to be in good faith:

AGC-100 conducted a second search for documents responsive to Plaintiff's request within our office. This search was

> reasonably calculated to obtain responsive records because the attorneys who provided legal advice related to the revisions to the ATCS hiring process were asked to review their records.

There is no dispute that the search described in this simple statement was reasonable under the circumstances. Rojas does not challenge the scope or methods of the search described in this statement. Nor has Rojas argued that the FAA should have expanded its search or found specific categories of additional documents. *Cf. Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 988 (9th Cir. 2009) (rejecting the claim that the government's searches were inadequate because they failed to uncover documents referenced in produced records); *Lane v. Dep't of Interior*, 523 F.3d 1128, 1139 (9th Cir. 2008) (same). While we have indicated that an agency's search might be insufficient if "other databases are likely to turn up the information requested" or if a standard search turns up leads "that suggest other records might be located elsewhere," *Hamdan*, 797 F.3d at 772, Rojas does not suggest there was any such deficiency here. Rojas's FOIA request did not require a search of thousands of files or massive electronic databases, and Rojas does not argue otherwise.

Given the limited search required by Rojas's FOIA request, the agency's simple description of its search provided reasonably adequate detail. It describes who was asked to conduct a search—the attorneys who were involved in the ATCS hiring process revisions, i.e., the only persons in the Office of the Chief Counsel who would have responsive documents. It also describes the search methods used and the body of records examined: the attorneys reviewed their files for relevant documents. In the context

of this particular search, nothing more was required to provide a reasonable description of the files searched or the search procedure used.

The majority fails to provide any reasonable analysis or explanation for its contrary—and conclusory—holding that the FAA's declaration "falls short" of what is required. Maj. at 22. Instead of explaining why the FAA's description of its search was not "reasonably detailed" in the particular context of this case, *see Hamdan*, 797 F.3d at 770, the majority makes a rote recital that the declaration "offers no details about how the search was conducted," because it fails to describe "the number of attorneys involved, the search methods they used, the body of records they examined, or the total time they spent on the search." Maj. at 22. This criticism is not reasonable. The declaration provides all relevant information: the office that conducted the search, the persons asked to conduct the search, the search procedure, and the search scope. Although the declaration does not state how many attorneys were involved, or how much time was spent on their search, the majority fails to explain why the lack of such details here makes the information that was provided fatally inadequate. While more details may be needed to demonstrate the adequacy of a search involving large databases in multiple locations and with numerous custodians, it is not reasonably required in this context.

Nor does our precedent support the majority's conclusions. The cases cited by the majority merely reviewed the agency declarations and approved them. Maj. at 22 (citing *Lane*, 523 F.3d at 1139; *Citizens Commission on Human Rights v. FDA*, 45 F.3d 1325, 1328 (9th Cir. 1995)). We have never held that specific details were required or that the absence of such details would render a

declaration per se insufficient. Our case law requires only that an affidavit be "reasonably detailed." *Hamdan*, 797 F.3d at 770. What constitutes a "reasonably detailed" affidavit must—reasonably—depend on the context of the particular search. By ignoring the context, the majority requires an agency to incant magic words, and ignores our touchstone of reasonableness under the circumstances.

Because the declaration here is "reasonably detailed" to establish that the FAA's search was adequate in the circumstances presented here, the FAA is entitled to summary judgment on this issue as a matter of law.

BUMATAY, Circuit Judge, concurring in part and dissenting in part:

Our task should have been simple. Exemption 5 of the Freedom of Information Act ("FOIA") protects only "inter-agency or intra-agency memorandums or letters" from disclosure under the Act. 5 U.S.C. § 552(b)(5). As Justice Scalia stated, "the most natural meaning of the phrase 'intra-agency memorandum' is a memorandum that is addressed both to and from employees of a single agency" and an "inter-agency memorandum" is "a memorandum between employees of two different agencies." *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting). These definitions leave no room for documents created by those outside of an agency's employment. To me, that is the end of the inquiry and Exemption 5 doesn't cover consultant work product.

But finding Congress's work inadequate, the majority picks up its drafting pen and bestows on us a supposedly better law. Contending that Congress actually adopted sub

silentio a "consultant corollary" through the otherwise clear language of Exemption 5, the majority now rules that the government no longer needs to publicly disclose documents made by private-sector consultants for executive agencies.

How does the majority justify this judicial rewrite?  It's *purpose* all the way down.  The majority creates an "escape route from the prison of the text,"[1] by invoking Exemption 5's supposed purpose and imposing a more faithful—as the majority sees it—version of the law.  But invocation of purpose is nothing more than a "bald assertion of an unspecified and hence unbounded judicial power to ignore what the law says."  *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1077 (2020) (Thomas, J., dissenting) (quoting Reading Law 343).

Because I do not believe that our limited judicial role allows us to subvert the plain text of a law to our own sense of its purpose, I respectfully dissent.

## I.

APTMetrics, a private consulting firm independent of the federal government, developed assessment tests for hiring air traffic controllers for the Federal Aviation Administration.  Jorge Rojas, a rejected applicant, filed suit under FOIA seeking three documents summarizing the assessment tests created by APTMetrics.[2]  The FAA sought

---

[1] Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 39 (2012) ("Reading Law") (quoting Patrick Devlin, The Judge 16 (1979)).

[2] That the documents at issue were summaries rather than the test themselves makes little difference under the plain meaning of Exemption 5.  The exemption focuses on *who* created the memorandums or letters,

to withhold the documents under Exemption 5.[3]    But APTMetrics, all agree, is not an agency under FOIA.  *See* 5 U.S.C. § 551(1) (An "agency" must be an "authority of the Government of the United States.").    Nor has the FAA argued that APTMetrics consultants are so embedded within its structure that they should be deemed FAA employees.[4]  By its plain text then, Exemption 5 doesn't protect APTMetrics's documents from disclosure.[5]

---

not on their purpose or substance.  *But see* Maj. Op. 18 n.3 (finding that the documents were summaries to be critical).

[3] Exemption 5 states, in full:

> This section does not apply to matters that are—. . . inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested[.]

5 U.S.C. § 552(b)(5).  A document, thus, must satisfy two conditions to qualify as a FOIA withholding exemption.  *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  Since the first condition—being an "intra-agency memorandum[]"—is not met in this case, I do not address the second condition.

[4] Rather, it is the opposite.  The FAA purposefully held out APTMetrics as "outside experts" who developed and independently validated the assessment tests.

[5] With respect, I believe Judge Collins's interpretation of Exemption 5 suffers from two flaws.  First, Judge Collins seems to view "intra-agency memorandums" as merely a geographical condition—only requiring that the memorandum "be intra-agency," meaning within the agency.  *See* Collins Concurrence at 24  Setting aside that no one would ever use the word "intra-agency" as a location, FOIA *only* applies if the

The majority disputes none of this; yet, it concludes that Exemption 5 applies nonetheless based on FOIA's supposed purpose and a desire to avoid the parade of horribles it envisions if we were to give the provision its plain meaning. The majority first divines from FOIA's legislative history that, despite the exemption's limited scope, Congress's "purpose" was to broadly "shield[] privileged communications from disclosure." Maj. Op. 13. Second, the majority fears that Exemption 5's plain meaning would chill communications between consultants and government employees, resulting in "poorer" decisionmaking and policies. Maj Op. 13 (quoting *NLRB v. Sears, Roebuck &*

---

document is within the agency in the first place. *See Berry v. Dep't of Justice*, 733 F.2d 1343, 1349 (9th Cir. 1984) (limiting "agency records" to information "in the possession of an agency"). So this interpretation effectively reads the term out of the statute. It's also unclear how Judge Collins's location-based reading applies to "inter-agency" memorandums—does it mean that the document is simultaneously present in two agencies?

Second, Judge Collins believes Exemption 5's second condition—that the document would not be "available by law to a party"—means that "intra-agency memorandum" refers to any document that falls "within the agency's litigation privileges." *See* Collins Concurrence at 26–27. Yet under this reading, "intra-agency" does no work at all. And we turn grammar on its head if we treat a limiting dependent phrase, like Exemption 5's second condition, as totally eliminating the words to which it is dependent.

At the end of the day, even if Judge Collins's interpretation were *permissible*, I continue to believe our duty is to "seek the *best reading* of the statute by interpreting the words of the statute, taking account of the context of the whole statute, and applying the agreed upon semantic canons." Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2121 (2016) (emphasis added). In this case, the *best* and "most natural" reading of the phrase is that the "memorandums" must be "to and from employees of a single agency." *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting).

*Co.*, 421 U.S. 132, 150 (1975)).  Finally, the majority thinks an ordinary-meaning interpretation of the provision would potentially vitiate the attorney-work-product privilege of an agency's outside counsel.  *Id*. at 15.

To accommodate these considerations, the majority engrafts a "consultant corollary" to Exemption 5, whereby any document may now be subject to exemption if drafted by anyone "act[ing] in a capacity functionally equivalent to that of an agency employee in creating the document."  Maj. Op. 17.

## II.

## A.

In my view, we can never let perceived legislative purpose eclipse the ordinary meaning of statutory text.  If a statute has a clear and natural reading, as is the case here, we are stuck with that meaning—even if we believe Congress might disagree with the outcome in a particular case.  This limited judicial role derives directly from the structure of our Constitution and separation-of-powers principles.

Lawmaking is not a tidy affair.  It can be a "clumsy, inefficient, even unworkable" process.  *INS v. Chadha*, 462 U.S. 919, 959 (1983).  That is by design.  *See id.*  The Constitution requires bicameralism—meaning that legislation must pass both the House and Senate with their respective rules and committees.  *Id.* at 948–49 (citing Article I of the Constitution).  When Congress is at its full complement, it consists of 535 legislators from various backgrounds, regions, and beliefs, split into two chambers with different constituencies and political interests.  *Id.* at 948–51; Apportionment Act of 1911, 37 Stat. 13, 13–14; Apportionment Act of 1929, 46 Stat. 21, 26–27.  The

Constitution also requires presentment to the President, who provides a separate "national perspective" to legislation. *Chadha*, 462 U.S. at 948 (simplified).

Given this, I am skeptical that the majority could so easily discern the legislative purpose behind the FOIA exemptions. When we sit en banc, we're only 11 judges— yet, it is often difficult to find agreement among our small number. It is doubtful that we could extract a common purpose from a body almost 50 times as large, as the majority purports to do.

Legislation, moreover, is often about the art of compromise. Even when Congress unites to tackle a national issue, "its Members may differ sharply on the means for effectuating that intent." *Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986). Given the clash of purposes, interests, and ideas, "the final language of the legislation may reflect hard-fought compromises." *Id.* After all, no legislation pursues its purposes at all costs, so "it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646–47 (1990) (simplified). In other words, when we allow legislative purpose to override statutory text, we undo these legislative compromises and recalibrate any balances struck by Congress. And we do so without any limiting principle except our own discretion.[6]

---

[6] To be clear, this doesn't mean we cannot interpret statutes based on their context. If contextual clues help give meaning to the words of the statute, we may readily employ them. *See* Reading Law 153 ("Perhaps no interpretive fault is more common than the failure to follow

More troublesome still is the majority's reliance on legislative history to determine Congress's purpose in enacting FOIA exemptions. *See* Maj. Op. 13–14 (quoting a single Senate committee report to represent Congress's intent to encourage "frank discussion of legal and policy matters"). But there are significant problems with using legislative history to single out congressional intent. *See Fazaga v. FBI*, 965 F.3d 1015, 1081–82 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc). In any event, judges have found other congressional purposes in FOIA, too. For one, the Supreme Court has said that *the* "core purpose" of FOIA is to "contribut[e] significantly to public understanding of the *operations or activities of the government*." *U.S. Dep't of Def. v. Fed. Labor Relations Auth*., 510 U.S. 487, 495 (1994) (simplified). That is why the Court has continuously reaffirmed that FOIA requires "full agency disclosure" unless exempted under "clearly delineated statutory language." *Id*. (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976)).

If purpose rather than text governs, which purpose prevails here? While some legislators may have felt that protecting government privileges was of paramount importance, others may have believed that achieving government transparency was more critical. As judges, we

the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). For example, here, in FOIA, two other exemptions specifically authorize the non-disclosure of documents created by non-government employees. *See* 5 U.S.C. § 552(b)(4), (8). That Congress did not include such express language in Exemption 5 is strong contextual evidence against the so-called consultant corollary. But what we can't do is try to discern some overriding extratextual policy purpose to then eclipse the plain meaning of statutes.

are not well-situated to step into the shoes of our elected representatives and select a purpose to guide our interpretation. *See Diamond v. Chakrabarty*, 447 U.S. 303, 317 (1980) ("[T]he balancing of competing values and interests" requires "the kind of investigation, examination, and study that legislative bodies can provide and courts cannot."). That is exactly what the majority does, however, by prophesying what Congress would have enacted if only it better understood its own purposes. *See, e.g.*, Maj. Op. 14 ("A Congress whose aim was to further the purposes just discussed would not have limited Exemption 5's coverage to communications authored by agency employees.").

Indeed, Exemption 5's limitation to inter- and intra-agency materials may have been the compromise between Congress's dueling purposes. By ignoring its plain meaning, we subvert any legislative compromise baked into its enacted text. Furthermore, it's not clear how else Congress could have expressed its rejection of the consultant corollary. After all, the language of Exemption 5 does precisely that—it leaves no room for consultant documents to be exempted. But that wasn't enough for the majority. Perhaps, a congressional amendment to Exemption 5—"and we really mean it"—would suffice.

Most disconcerting about the approach articulated by the majority is the threat to the separation of powers. Any student of the Constitution can recite that Congress makes the laws and judges interpret them. *See Patchak v. Zinke*, 138 S. Ct. 897, 904 (2018) ("To the legislative department has been committed the duty of making laws; . . . and to the judiciary the duty of interpreting and applying them[.]"). By reading a statute not by its text, but its purpose, judges come dangerously close to legislating—except without the political accountability.

If there was any doubt about this concern, look no further than the majority's test for when a document meets the "consultant corollary" exemption.  It states that any document drafted by anyone "act[ing] in a capacity functionally equivalent to that of an agency employee in creating the document" is subject to the protection of Exemption 5. Maj. Op. 17.  So instead of the straightforward language used in Exemption 5, citizens must now parse the majority's newfangled, multi-factor test[7] to gain the disclosure of government documents.  While this test might make normative sense, and congressional staffers might admire its drafting, none of it is derived from the text of Exemption 5 or frankly any other legislation.  We simply made it up.  *Cf. California v. EPA*, 978 F.3d 708, 718 (9th Cir. 2020) ("There is a word for picking the law that determines a party's future conduct: legislation[.]") (emphasis omitted).

### B.

The same goes for the majority's concerns for the consequences of interpreting Exemption 5 according to its text.  We don't supersede or amend congressional enactments simply because we (or our belief that Congress would) disagree with the outcome in a particular case.  Our job requires neutrality to a statute's consequences.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 576 (1982) ("The remedy for any dissatisfaction with the results in particular cases lies with Congress and not with th[e]

---

[7] As I understand it, the majority's consultant corollary test requires (1) establishing what an "agency employee" does for a particular agency; and (2) determining whether the consultant acted in a "functionally equivalent" capacity.  No doubt further litigation will be required to refine the meaning of each step and establish the prongs for each factor and, of course, the subprongs to the prongs for each factor.

[c]ourt[s].").  We don't reverse engineer our interpretation of a law by surveying the outcomes it produces and then selecting the reading that reaches our favored results.  That gets it backwards.  *See Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 134 (2015) (A "harsh outcome" does not justify deviating from "the import of Congress' chosen words.").  So it's inappropriate to create a "consultant corollary" based on fear that not doing so would discourage outside consultants from working with agencies.  *See* Maj. Op. 14.

For what it's worth, the majority's overwrought concern for the protection of an agency's outside counsel's work product is also a bit of a red herring.  *See* Maj. Op. 15.  First, that is not this case.  APTMetrics is not outside counsel and no one suggests it is the functional equivalent of one.  If such a case arises in the future, we can decide whether the attorney-client privilege is so sacrosanct that we must override FOIA's statutory text; but there is certainly no reason to do that here.  Second, I am not so sure that such a case would arise.  The FAA is not like a normal client.  It can't just retain any lawyer of its choice.  It is, after all, an Executive agency.  49 U.S.C. § 106.  It has a cadre of lawyers in its chief counsel's office.[8]  It sits within the Department of Transportation with its own team of lawyers. 49 U.S.C. § 106(a).  And, by law, the Department of Justice provides it legal counsel and *must* represent it in all litigation.  *See* 28 U.S.C. §§ 514, 516; 5 U.S.C. § 3106.  So, I seriously doubt that the need to protect privileged communications of outside counsel is so grave and so stark

---

[8] *See Office of the Chief Counsel*, Federal Aviation Administration, https://www.faa.gov/about/office_org/headquarters_offices/agc/ (Sept. 19, 2017, 2:36 PM).

that we must discard the plain reading of the text enacted by Congress.[9]

## C.

I acknowledge that Justice Scalia, after analyzing the "natural meaning" of Exemption 5, went on to consider FOIA's purpose and endorse a consultant corollary. *Julian*, 486 U.S. 1, 18 n.1 (Scalia, J., dissenting). In my view, the principles that Justice Scalia spent a lifetime advocating—textualism, separation of powers, deference to the political branches[10]—are more important than any one of his individual decisions, let alone dicta buried in a footnote of a dissent he authored more than 30 years ago. That all judges, to varying degrees, adhere to the plain meaning of statutory text is Justice Scalia's lasting legacy. It is more faithful to that legacy to maintain that the plain meaning of the text must prevail here.

---

[9] Judge Collins contends that we must confront the attorney-client issue here because another agency—the FDIC—may potentially need to rely on outside attorneys. *See* Collins Concurrence 30–31. I think this example only proves my point. Unknown issues may pop up in such a situation. For example, the FDIC guidelines governing outside counsel cited by Judge Collins may impact our analysis. *See id*. at 30–31. We also don't know if these hypothetical outside counsel are hired as special Government employees. *See* 18 U.S.C. § 2020(a). Or if other federal laws, such as conflicts and ethics requirements, apply to outside counsel. Point being, we don't need to decide this question in this case.

[10] *See, e.g.,* Neil M. Gorsuch, *Of Lions and Bears*, *Judges and Legislators*, *and the Legacy of Justice Scalia*, 66 Case W. Res. L. Rev. 905, 912 (2016).

## III.

I concur with the majority that the FAA was not required to search APTMetrics' records for responsive documents. But, as Judge Ikuta explains in her well-reasoned dissent, the majority was also incorrect that FAA's search was inadequate. Most fundamentally, however, because a perceived legislative purpose doesn't eclipse the natural meaning of statutory text, I respectfully dissent from the judgment of the court.