## PUBLIC INFORMATION ACT

### DEFINITION OF "PUBLIC RECORD" – WHETHER THE DELAYED BROADCAST OF POLICE RADIO DISPATCH TRANSMISSIONS IMPLICATES THE PUBLIC INFORMATION ACT

September 18, 2025

*The Honorable Julie M. Giordano*
*County Executive, Wicomico County*

For decades, members of the media, hobbyists, and others have listened to police dispatch communications by using radio scanners. In recent years, however, concerns about officer safety, personal privacy, and investigation integrity have led many law enforcement agencies to encrypt their radio communications, meaning that scanners are no longer able to pick up those communications. Some of these agencies' radio transmissions have simply gone silent as far as the public is concerned, while other agencies have opted to allow various private platforms to broadcast otherwise encrypted radio communications on a delay.

You have indicated that Wicomico County is currently confronting these types of questions about law enforcement agencies' radio dispatch transmissions. In particular, you are concerned about what limitations Maryland's Public Information Act ("PIA" or "the Act") might place on the disclosure of these transmissions as well as what implications the PIA may have for delayed transmission. Although live radio transmissions are not within the scope of the PIA, audio recordings used to facilitate delayed broadcasts might be. Thus, you have asked whether the delayed public broadcast of these communications falls within the scope of the PIA and, if so, whether any provisions of the PIA would limit a government's ability to provide or permit those delayed broadcasts.

As explained in detail below, if a governmental unit itself were to record dispatch communications and then broadcast those recordings on a delay, the unit would clearly need to follow the PIA's requirements and thus, before providing the broadcast, redact any information from those recordings that must be withheld from public inspection under the PIA. In practice, given the work necessary to review each recording to remove the information not subject to disclosure, the public would have to wait a significant amount of time to hear the broadcasts.

Because of those practical concerns, it is our understanding that some law enforcement agencies have tried alternative arrangements to facilitate broadcasting of the radio transmissions to the public. For example, a law enforcement agency might give members of the press or private contractors the ability to access the live, unencrypted version of the dispatch communications in real time, and the news organization or private contractor might make a recording of the live dispatch communications and then broadcast that recording to the public on a brief delay.

Assuming a delayed-broadcast arrangement of that type involves the creation of a recording as a step in the process, the arrangement implicates the PIA if the recording comes within the PIA's definition of a "public record." A "public record" means documentary material, including a recording, "made by a unit or an instrumentality of the State or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business." Md. Code Ann., Gen. Prov. ("GP") § 4-101(k). To interpret that definition of "public record" under the PIA in the past, we have relied on federal precedent interpreting the scope of the similar term "agency records" in the federal Freedom of Information Act, and we think it makes sense to again do so here. Under the relevant federal test, a record generated by a third party qualifies as an "agency record" only if the agency created or obtained the requested materials and also controls the requested materials. Applying that test to the type of delayed-broadcast arrangements about which you have asked, there are at least some circumstances where the recording may qualify as a "public record" subject to the PIA's mandatory exemptions even when the mechanical process of generating or broadcasting the recording falls on a contractor or other third party. Ultimately, however, the answer will depend on the specific details of the arrangement. For that reason, the General Assembly may wish to clarify when, and under what circumstances, law enforcement agencies can facilitate near-contemporaneous delayed broadcasts of their radio dispatch transmissions.

# I
# Background

## A.  *Maryland's Public Information Act*

The General Assembly enacted Maryland's PIA to ensure "access to information about the affairs of government and the official acts of public officials and employees." GP § 4-103(a). This objective is accomplished by providing for inspection and

copying of public records unless the Act provides otherwise. GP §§ 4-201(a) and 4-205(b). For purposes of the PIA, a "public record" is "the original or any copy of any documentary material," in "any form," that is "made by" or "received by" "a unit or an instrumentality of the State or of a political subdivision . . . in connection with the transaction of public business." GP § 4-101(k)(1); *see also* 106 *Opinions of the Attorney General* 100, 101 (2021). A person may request a public record from a custodian, who is defined as, among other things, an "authorized individual who has physical custody and control of a public record." GP § 4-101(d)(2). The custodian's obligations include granting or denying a PIA request within certain time limitations, GP § 4-203(a), and, if a request is denied, providing certain information to explain the denial, GP § 4-203(c).

The PIA's provisions also contain exemptions from the general rule of disclosure for certain kinds of records or information contained in records. Some of these exemptions are merely discretionary, giving the agency the option to withhold the records from public inspection, but others are mandatory and therefore require shielding from disclosure under the PIA. Many of these mandatory exemptions "are intended to address the reasonable expectation of privacy" that individuals have in information about them that may be contained in public records. *Immanuel v. Comptroller*, 449 Md. 76, 82 (2016) (quoting *University Sys. of Md. v. Baltimore Sun*, 381 Md. 79, 88 (2004)). For instance, GP § 4-306 requires a custodian to deny inspection of certain hospital records that contain "general or specific information about one or more individuals," and, under GP § 4-329(b)(1), a custodian must redact "the part of the public record that contains . . . medical or psychological information about an individual, other than an autopsy report of a medical examiner." A custodian may be civilly liable for "actual damages" if a court finds that the custodian "willfully and knowingly allow[ed] inspection or use of a public record" in violation of the PIA and "the public record names or, with reasonable certainty, otherwise identifies the individual" by certain identifying factors, including "an address." GP § 4-401(a); *see also* GP § 4-402(a)(1) (providing criminal penalties for a person who "willfully or knowingly violate[s] any provision of [the PIA]").

## B.     *The PIA and Emergency Service Provider Records*

In the fifty-some years since the PIA was enacted, questions have arisen about whether records related to, and generated by, emergency service providers must be disclosed under the PIA. In

1986, we addressed a question of whether "tape recordings of calls to 911 Emergency Telephone System centers" were subject to disclosure and, if so, whether there were exemptions from disclosure that might require or permit denial of inspection of such records. 71 *Opinions of the Attorney General* 288 (1986). At that time, the "minimum requirements" for all local 911 systems included "electronic recording, with playback capability, of all incoming calls." *Id.* at 289. The tape recordings were "physically maintained in the local 911 emergency communications centers." *Id.* We concluded that, "[i]n light of the PIA's broad scope, there is no question that the 911 emergency centers operated by the counties are governmental agencies subject to the PIA and that the tape recordings of telephone calls to those centers are public records within the meaning of the PIA." *Id.* at 290.

Although it was clear that 911 recordings were public records generally subject to disclosure under the PIA, we also recognized that "[p]articular calls for emergency assistance might well reveal intimate personal information about the caller or others," and stated that, when the requester was not a person in interest,[1] "the PIA's exceptions can and should be construed somewhat more liberally than would otherwise be the case." *Id.* at 291. We explained that "statements concerning an injured or ill person's symptoms or condition, provided to a 911 center operator for the purpose of obtaining appropriate emergency medical care, are 'medical or psychological information' that must be withheld" under what is now § 4-329(b) of the PIA. *Id.* at 292. Thus, we concluded, "if access to a tape is requested, the tape must be reviewed to determine whether portions of it contain information that must be deleted before the tape's release."[2] *Id.*; *see also* 90 *Opinions of the Attorney General* 45, 53-54 (2005) (concluding that "specific information" in an ambulance dispatch event report "concerning an individual's medical history or condition . . . should be redacted before the record is disclosed"); PIA Compliance Bd. Op. No. 24-93, at 7 (Aug. 27, 2024) (finding that GP § 4-329(b) applied to certain portions of police officer body worn camera footage of an

---

[1] A "person in interest" is usually the "person or governmental unit that is the subject of a public record or a designee of the person or governmental unit." GP § 4-101(g).

[2] We also considered in our 1986 opinion whether other exemptions might apply to 911 call center recordings, including what is now § 4-351(a), the PIA's discretionary exemption for records of investigations. 71 *Opinions of the Attorney General* at 294-95. We concluded that the exemption might apply under certain circumstances. *Id.* In light of your focus on *mandatory* exemptions—i.e., records or information for which inspection *must* be denied—we do not detail that portion of the opinion here.

interaction between police and an individual who was later taken to the hospital).

### C. Radio Scanners and Emergency Services Communications

In compliance with our policy for opinion requests from local governments, you have provided a memorandum from the Wicomico County Attorney addressing the status of police radio dispatch calls under the PIA. In that memorandum, the County Attorney explains that, "[h]istorically, anyone in Wicomico County with a capable radio scanner could tune into the appropriate channel for police, fire or EMS and freely listen to the broadcasts as they happened." Memorandum from Paul Wilber, Wicomico County Attorney, to Wicomico County Executive 1 (Sept. 10, 2024) ("Wilber Memorandum"); *see also* Terrence McCoy, *Listening, But Finding Less to Hear*, Wash. Post, Dec. 31, 2018, at B04 (providing anecdotal and historical information about hobbyists who listen to police scanners). Recently, however, "all police radio dispatch transmissions were encrypted so that any radio or scanner outside of the police force would no longer be able to access the newly encrypted police radio dispatch transmissions." Wilber Memorandum 1. According to the County Attorney, the encryption applies only to *police* transmissions, and the transmissions of local fire or EMS services "can still be easily accessed." *Id.* Nevertheless, the County Attorney states that "[t]his new prohibition on citizens freely listening into the Police radio dispatch calls has caused some concerns among local individuals pursuing the transparent reporting and communications by the Police force." *Id.*[3]

Wicomico County is not alone in moving to encrypt law enforcement radio dispatch transmissions. Many large cities, including Denver, San Francisco, Baltimore, Chicago, and New York, have encrypted emergency services radio communications to varying degrees. *See* Ernesto Londoño, *The Wildly Popular Police Scanner Goes Silent for Many*, Int'l N.Y. Times, Dec. 27, 2023, at 9. As in Wicomico County, that decision has led to criticism from pro-transparency and police accountability advocates. *See, e.g.,* Eric Bedner, *Police Encrypting Radio; Concerns Raised*, Record-Journal (Meriden, Conn.), Oct. 16, 2024, at C001 (reporting comments of ACLU of Connecticut executive director that "[p]olice are public servants and should be required to operate with a measure of accountability and transparency," and that

---

[3] The County Attorney clarifies that the issue "relates only to police dispatch transmissions not to any subsequent encrypted operational transmissions." Wilber Memorandum 1.

"[e]ncrypted communications in policing prevent the public, journalists, and advocates from accessing information about their communities in real time").

Some jurisdictions have thus looked for alternative ways to balance the interests of security and transparency. For example, in Baltimore City, the police department has "encrypt[ed] its radio traffic and implement[ed] a 15-minute delay on live radio broadcasts available only" on an internet platform called "Broadcastify,"[4] though we do not know all the details of that arrangement. *See* Darcy Costello, *Baltimore Police to Encrypt Radio Transmissions and Offer Public Access on 15-Minute Delay*, Balt. Sun, June 30, 2023. Some other jurisdictions have considered and rejected delayed broadcasting, citing concerns about transmitting witness and victim information over the radio to the public. *See, e.g.*, Jeffrey A. Roberts, *Its Radio Transmissions Encrypted Since 2016, Aurora Police Considered—Then Rejected—a Delayed Public Feed on Broadcastify*, Colorado Freedom of Information Coalition (May 30, 2024), https://coloradofoic.org/its-radio-transmissions-encrypted-since-2016-aurora-police-considered-then-rejected-a-delayed-public-feed-on-broadcastify/. In some of those jurisdictions, other options have been explored, such as providing news media with special access to real-time communications via scanners that can receive the encrypted communications. *Id.*

## II
## Analysis

We turn to your question of whether the Public Information Act applies to delayed broadcasts of law enforcement dispatch communications and, if so, what limitations the Act might place on their disclosure.

---

[4] Tactical communications by the Special Weapons and Tactics ("SWAT") division have apparently been fully encrypted since 2021 and are not available on the delayed broadcast. *See* Press Release, Baltimore Police Department, BPD to Implement Timed Encryption While Providing Public Streaming of Radio Transmission (June 30, 2023), *available at* https://www.baltimorepolice.org/news/bpd-implement-timed-encryption-while-providing-public-streaming-radio-transmission#:~:text=Yes.,media%20and%20public%20via%20Broadc astify.

### A.   The PIA Restricts the Disclosure of Certain Information from "Public Records"

To answer your question, we begin by stressing two key aspects of the PIA. The first is that the PIA's provisions apply solely to "public records," as defined by the Act. GP § 4-201(a). That is, the PIA governs only "documentary material" that is "made by" or "received by" a unit of State government or a political subdivision in the transaction of public business. *See* GP § 4-101(k) (defining "public record"). The definition includes documentary material that is "in any form," including "a recording" or "a tape," GP § 4-101(k)(1)(ii), and thus clearly applies to audio recordings when made or received by the government. But the definition does not apply (and the Act thus has not historically been implicated) when scanners merely pick up unencrypted police radio transmissions in real time, because that interception[5] does not, at that point, create "documentary material" that has been preserved in some way. *See* GP § 4-101(k). Rather, the scanners simply pick up passing radio transmissions that are not, in and of themselves, "public records" covered by the PIA.

The second key aspect of the PIA relevant here is that the PIA's mandatory exemptions generally prohibit custodians from disclosing protected records (or information from those records) regardless of whether disclosure is requested under the PIA. *See, e.g.*, GP § 4-328 ("Unless otherwise provided by law, a custodian shall deny inspection of a part of a public record, as provided in this part."). For example, if a record qualifies as a "personnel record of an individual" that is protected under GP § 4-311, then a custodian not only must deny inspection if the record is requested under the PIA, but also may not otherwise disclose that record by, for instance, affirmatively posting the record on the agency's website. *See, e.g.*, 65 *Opinions of the Attorney General* 365, 370 (1980) (concluding that, if a local official obtained someone's personnel file and then voluntarily disclosed the contents to

---

[5] Maryland's Wiretap Act generally prohibits the willful interception of electronic, oral, or wire communications without the consent of all parties. Md. Code Ann., Cts. & Jud. Proc. § 10-402(a). However, the Wiretap Act contains exceptions, including one that permits interception of radio communications transmitted "[b]y any governmental, law enforcement, civil defense, private land mobile, or public safety communications system, including police and fire, readily accessible to the general public." *Id.* § 10-402(c)(7)(ii)(2); *see also* 71 *Opinions of the Attorney General* at 289 n.5 (stating that "[t]he taping of such emergency telephone calls is lawful, notwithstanding the general prohibition against wiretapping").

members of the press, he would violate the PIA by "intentionally releas[ing] prohibited information" covered by a mandatory exemption); *cf.* 90 *Opinions of the Attorney General* 17, 22 (2005) (opining that a certain type of meeting must be closed "to avoid a violation of the provision of the Public Information Act prohibiting public disclosure of a personnel record"); Letter from Jack Schwartz, Chief Counsel, Opinions & Advice, to Barbara Trader, at 2 (Oct. 7, 1996) (advising that, under the PIA, a public body cannot "divulge . . . information derived from a personnel record" in an open meeting). A contrary interpretation would render the PIA's mandatory exemptions meaningless.

Based on these principles, once a law enforcement agency or other governmental emergency services provider records its radio communications, those recordings are clearly public records subject to the PIA, 71 *Opinions of the Attorney General* at 288, and the entity can only disclose the recordings in compliance with the PIA's mandatory exemptions. In other words, even though the live transmission of the communications over the radio is not a "public record," the actual recordings made by the government meet the definition of "public record" because they are "documentary material" that has been "made" or "received" by the law enforcement agency as it carries out its public business. GP § 4-101(k)(1). Therefore, if a law enforcement agency were to record its radio transmissions and then broadcast those recordings on a delay, the law enforcement agency would need to comply with the PIA's prohibitions on disclosure and redact from those recordings, before the broadcast, any information covered by mandatory PIA exemptions.

However, more difficult questions arise when a third party, such as a contractor, is involved in the creation of the recording or maintains sole possession of the recording. For example, to facilitate delayed broadcasts of dispatch communications, there might be some circumstances where a recording of the law enforcement agency's radio transmissions is generated and broadcast by the employees or facilities of a private contractor, and the recording never comes into the agency's possession. If that recording is not a "public record," it can be broadcast without redacting information covered by the PIA's mandatory exemptions. But if it *is* a public record, its disclosure would be subject to the PIA's mandatory exemptions, and the recording would need to be reviewed (and, if necessary, redacted) before it could be broadcast or otherwise released.

### B. *Federal Case Law Offers Persuasive Authority for Defining "Public Records" Under the PIA*

We begin our analysis of that more complicated issue with the PIA's definition of "public record." As noted above, to count as a "public record," a recording must be either "made by" or "received by" a unit or instrumentality of State or local government in connection with public business. GP § 4-101(k)(1)(i). Although the underlying communications memorialized by the recording may have been "made by" a law enforcement agency in the sense that the agency's officers generated the oral communications, the record at issue is *the recording* used in the process of broadcasting, on a delay, those communications. The oral communications by themselves are not "documentary material" so cannot be a "public record." Our focus is thus on when a recording generated from the oral communications is a "public record."

In the past, when difficult questions have arisen about whether a record is a "public record" under the PIA, we have relied on federal cases interpreting the similar term "agency record" in the federal Freedom of Information Act ("FOIA"). Because the PIA and FOIA have the same general purpose, 80 *Opinions of the Attorney General* 257, 259 (1995), and because many provisions of the PIA were modeled on analogous provisions in FOIA, *see, e.g.*, 92 *Opinions of the Attorney General* 26, 45 (2007), "interpretations of the federal statute are [often] persuasive in interpreting" the PIA, 80 *Opinions of the Attorney General* at 259.

Under FOIA, the United States Supreme Court has developed a two-part definition of "agency record." A record is an "agency record" if: (1) the agency "either create[d] or obtain[ed]" the requested materials, and (2) the agency is "in control of the requested materials at the time the FOIA request is made," meaning "that the materials have come into the agency's possession in the legitimate conduct of its official duties." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989). The test is derived, in part, from the Court's earlier decision in *Forsham v. Harris*, 445 U.S. 169 (1980). In that case, the Court held that "written data generated, owned, and possessed by a privately controlled organization receiving federal study grants" were not "agency records" subject to FOIA's provisions, even though the federal government had funded the study. *Id.* at 171. Although the federal agency had the right to obtain the data in question, it had not exercised that right, and the Court explained that "FOIA applies [only] to records which have been *in fact* obtained, and not to records which merely *could have been* obtained." *Id.* at 186.

*Forsham* involved activities that the federal government merely funded, but federal courts have also applied the same two-part test to analyze the status of records of third parties with a closer relationship to a government agency, such as contractors. *See, e.g.*, *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996); *Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 878 F.3d 1258, 1262 (10th Cir. 2018).

Our Office has also relied on this federal case law to analyze whether third party records qualify as "public records" under the PIA. In a 1995 opinion, relying primarily on *Forsham*, we concluded that records of a licensed child care facility were not "public records" where the records were "maintained by private persons who have applied for residential child care facility licenses from the Department of Human Resources" and were "reviewed by the Department . . . but remain[ed] in the custody of the applicant." 80 *Opinions of the Attorney General* at 257. Consistent with *Forsham* and citing *Forsham* for support, we concluded that because the records were "created and maintained by a private entity" and never came into the "possession of a government agency," the PIA did not cover them. *Id.* at 259, 261. The PIA Compliance Board, which adjudicates certain disputes under the PIA, has also recently cited *Forsham* in concluding that an outside attorney's invoices were not "public records" of a municipality where they did not come into the municipality's possession. PIA Compliance Bd. Op. No. 25-73, at 11 (Aug. 15, 2025).

To be sure, the definitions of "agency record" and "public record" are not always the same. *See Office of the Governor v. Washington Post Co.*, 360 Md. 520, 534-36 (2000) (concluding that, even though White House records are not covered by FOIA because the President is not an "agency," the PIA nonetheless applied to the Governor because its scope was defined by the term "public record" rather than "agency record"). And although federal interpretations of FOIA have generally been given "significant weight" in interpreting analogous provisions of the PIA, *e.g.*, *Amster v. Baker*, 453 Md. 68, 79 (2017), it has become increasingly important in recent years to scrutinize whether Maryland should follow a federal interpretation of an analogous statute as the U.S. Supreme Court's strict textualist approach to statutory interpretation increasingly diverges from the Maryland courts' approach.

More specifically, the U.S. Supreme Court in recent years has become more and more likely to declare that its "analysis begins and ends with the text." *E.g.*, *Little Sisters of the Poor Saints Peter*

*& Paul Home v. Pennsylvania*, 591 U.S. 657, 676 (2020).  This brand of textualism is based on the premise that there is no such thing as legislative intent apart from the text, and that "there is no way to tell what" a legislature "intended except the text."  Antonin Scalia & John F. Manning, *A Dialogue on Statutory and Constitutional Interpretation*, 80 Geo. Wash. L. Rev. 1610, 1612 (2012); *see also, e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("Congress expresses its intentions through statutory text passed by both Houses and signed by the President (or passed over a Presidential veto).").

By contrast, although the Maryland courts always "start with the text," they seek to "ascertain and effectuate *the real and actual intent* of the Legislature," *United Parcel Serv. v. Strothers*, 482 Md. 198, 212 (2022) (emphasis added) (internal quotation marks omitted), including by consulting legislative history and other "extrinsic sources" of that intent, *Berry v. Queen*, 469 Md. 674, 687-88 (2020) (quoting *In re S.K.*, 466 Md. 31, 50 (2019)).  In fact, even when the text of a statute appears clear on its face, our Supreme Court will often consult legislative history and other extrinsic sources to confirm that its reading is in fact consistent with the real and actual intent of the General Assembly.  *See, e.g.*, *Pabst Brewing Co. v. Frederick P. Winner, Ltd.*, 478 Md. 61, 76 (2022).  Thus, when a federal interpretation of FOIA stems from principles of statutory construction that diverge from those of Maryland statutory interpretation, we should closely examine whether it makes sense to apply that reading to the PIA.

Here, however, we think the federal courts' two-part *Tax Analysts* test aligns with the text, structure, and purposes of the PIA.  The first prong of the federal test—i.e., that the agency must have "created or obtained" the record—is consistent with the PIA's requirement that a "public record" be "made by" or "received by" a governmental unit or instrumentality in connection with public business.  *See* GP § 4-101(k)(1)(i).  And the second prong—i.e., that the federal agency controls the record at the time of the request—is consistent with the PIA's implicit requirement that public records must have a government "custodian."  The PIA generally assumes that a public record will have a "custodian," *see* GP § 4-202(a) (requiring a person who wishes to inspect a record to request it from the custodian), and further assumes that only government entities will be "custodians."  For example, the term "official custodian," referring to the person with ultimate authority over a record, is explicitly limited to "officer[s] or employee[s] of the State or a political subdivision."  GP § 4-101(f).  And the PIA's judicial review provision assumes the defendant will be a

government entity. *See, e.g.*, GP § 4-362(c)(3)(i), (d)(1), (e), (f). Consistent with that understanding, our 1995 opinion concluded that, in general, only records in the possession of a governmental entity are public records. *See* 80 *Opinions of the Attorney General* at 259-60. Thus, even though a control requirement does not appear expressly on the face of the PIA, it is part of the surrounding context of the statutory scheme and necessarily informs the definition of a "public record" under Maryland law.

Because the federal test is consistent with the PIA, then, we will use the two-part *Tax Analysts* test as the starting point for our analysis of whether recordings created as part of a delayed broadcast of police radio transmissions would be "public records" under the PIA. We will discuss each prong in turn.

### C. Application of the Federal Test to Records Generated by Third Parties

#### 1. The First Prong: Whether the Agency Created or Obtained the Records

Under the first prong of the test, records generated by third parties, including contractors, generally will not be public records unless the agency actually receives them. That is because such records would not ordinarily be viewed as created (or made, to use the language of Maryland's statute) by the agency. *See* 80 *Opinions of the Attorney General* at 258-60; *Forsham*, 445 U.S. at 185-86; *Rocky Mountain Wild*, 878 F.3d at 1263; PIA Compliance Bd. Op. No. 25-73, at 11; Office of the Attorney General, *Maryland Public Information Act Manual* 1-9 (19th ed. 2024) ("PIA Manual").

But some federal courts have held that a record can potentially qualify as "created by" an agency when it is created by a third party *on behalf of* the agency, at least when the agency exercises "extensive supervision and control" over the creation of the record. *See, e.g.*, *Burka*, 87 F.3d at 515; *Forest County Potawatomi Cmty. v. Zinke*, 278 F. Supp. 3d 181, 196 (D.D.C. 2017); *Chicago Tribune Co. v. U.S. Dep't of Health & Hum. Servs.*, 1997 WL 1137641, at *13-14 (N.D. Ill. Mar. 28, 1997). In *Burka*, for instance, the United States Court of Appeals for the D.C. Circuit held that data tapes generated by a contractor for an agency study were effectively "created by" the agency because the agency had "extensive supervision and control . . . over collection and analysis of the data." 87 F.3d at 515. The agency itself was conducting the study and had designed a survey and questionnaire as part of the research

methodology but outsourced the actual collection of the data to a contractor. *See id.* at 510-12. The study protocol even made agency employees responsible for "[d]ay-to-day supervision" of the study, and survey personnel were instructed to identify themselves as calling on behalf of federal agencies. *Burka v. U.S. Dep't of Health & Hum. Servs.*, 1993 WL 13140669, at \*2-3 (D.D.C. Dec. 13, 1993).

Although not all federal courts agree that a record generated on behalf of an agency can qualify as having been "created by" the agency, *see, e.g.*, *Rocky Mountain Wild*, 878 F.3d at 1262, we think Maryland courts would more likely conclude that there are at least some circumstances where a document created by a third party on behalf of a government agency can qualify as a public record. The PIA, by its terms, applies to records "made by" a government unit. The ordinary meaning of "made by" is broad enough to encompass at least some records made through an intermediary. *See, e.g.*, *Black's Law Dictionary* 1144 (11th ed. 2019) ("make" can mean "[t]o cause (something) to exist"); *Cambridge Dictionary*, https://dictionary.cambridge.org/dictionary/english/make (last visited Sept. 15, 2025) ("to produce something" or "to cause something," or "to produce; cause to exist or happen; bring about"). In addition, cases in other contexts recognize that a record can be "made by" a person when the person acted through an intermediary but was, in substance, directly responsible for the record's creation. *See, e.g.*, *United States v. Giles*, 300 U.S. 41, 48-50 (1937) (holding that the word "make," in a criminal statute prohibiting the making of false entries in bank records, included deliberate action causing the creation of a false entry through an intermediary); *United States v. Danielczyk*, 788 F. Supp. 2d 472, 479-82 (E.D. Va. 2011) (holding that donors "made" campaign contributions when they arranged for others to contribute funds with the expectation of reimbursement), *rev'd in non-relevant part*, 683 F.3d 611 (4th Cir. 2012).

To be clear, however, it is not enough that the government was the but-for cause of a record's creation. That, without more, does not support a conclusion that a record was "made by" the government. *See Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1091 (Colo. 2011) (en banc) (rejecting the view that "any writing memorializing an event in which a public official participates would constitute a 'writing made . . . by the state'"). So, for example, the fact that an activity was funded by the government, without more, does not mean the government "created" or "made" the records. *See, e.g.*, *Burka*, 87 F.3d at 515; *Chicago Tribune*, 1997 WL 1137641, at \*13; *ExxonMobil Corp. v. Department of*

*Commerce*, 828 F. Supp. 2d 97, 105-06 (D.D.C. 2011). Nor is it enough, in the case of contractors, that the agency generally "monitors the performance and progress of the contractor," *ExxonMobil Corp.*, 828 F. Supp. 2d at 106, as that could transform most contractor records into agency records. *See also* PIA Compliance Bd. Op. No. 25-73, at 11-12 (concluding that invoices generated by outside attorney during representation of town, which were sent to insurance carrier but not to town, were not "public records" of town). Finally, that a third party may have an agency relationship with a government unit, without more, does not mean the unit "made" the third party's records. *Id.*

In any event, for those federal courts that have adopted the theory that records made by a third party on behalf of the government can qualify as "agency records," the courts have considered the totality of the circumstances in determining whether the agency effectively "created" the record. One circumstance courts have considered is the extent to which the agency controls the third party's activities, especially the creation of the disputed record itself. *Burka*, 87 F.3d at 511-12; *Chicago Tribune*, 1997 WL 1137641, at *13-15; *Beveridge & Diamond, P.C. v. U.S. Dep't of Health & Hum. Servs.*, 85 F. Supp. 3d 230, 237 (D.D.C. 2015). Relatedly, courts might also consider if the third party is conducting a task that applicable law requires the agency to perform and specifically requires the agency to retain responsibility for and control over. *See Zinke*, 278 F. Supp. 3d at 196. *But see Buholtz v. U.S. Marshals Serv.*, 233 F. Supp. 3d 113, 116 (D.D.C. 2017) (records relating to prisoner held in local jail that contracted with Marshals Service were not created on behalf of Marshals Service). And in the case of a contractor, the language of the contract itself may also be relevant. *See Zinke*, 278 F. Supp. 3d at 196 (considering it relevant that the contract expressly provided the contractor was acting "on behalf of" the agency); *In Defense of Animals v. National Insts. of Health*, 543 F. Supp. 2d 83, 100 (D.D.C. 2008) (examining contractual provisions in concluding that government agencies had "obtained" relevant records).

On the other hand, the fact that the government could have accessed the record upon request does not mean that the record was created "on behalf of" the government. *Forsham*, 445 U.S. at 185. Similarly, the fact that the agency relied on the records does not mean that the third party acted on behalf of the agency in creating them. *Rocky Mountain Wild*, 878 F.3d at 1262.

Ultimately, cases where federal courts have found that a contractor's or other third party's record was "created by" the

federal agency are the exception, not the rule. Even those federal courts that have recognized this possibility have required a high degree of supervision and control by the agency over the third party, or other significant indicia of an especially close relationship between the agency and the third party. *See, e.g.*, *Burka*, 87 F.3d at 515. The ordinary agency-contractor relationship—in which the agency sets the overall objectives, monitors progress at a high level, and receives final deliverables, but leaves day-to-day operations up to the contractor—generally will not suffice to make the contractor's records into agency records. *See ExxonMobil*, 828 F. Supp. 2d at 106. But we cannot discount the possibility that, in some circumstances, an agency will be found to have "created" (or "made") records through a third party.

### 2.   The Second Prong: Whether the Agency Controls the Records

Next, under the second prong of the *Tax Analysts* test, a record is subject to FOIA only if it is in the agency's control at the time the FOIA request is made, i.e., the record has "come into the agency's possession in the legitimate conduct of its official duties." 492 U.S. at 145. The most common factors that courts consider in making that determination seem to be:

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

*Zinke*, 278 F. Supp. 3d at 196. But these factors are not exclusive, and courts have considered others when circumstances warrant. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 220-21 (D.C. Cir. 2013) (concluding that "the four-factor test is not the only test relevant" when "special policy considerations" "are at stake"). The analysis thus depends on the totality of the circumstances. *E.g.*, *Consumer Fed'n of Am. v. Department of Agric.*, 455 F.3d 283, 287-88 (D.C. Cir. 2006).

In most situations, the question of control will be easy to resolve. For obvious reasons, the government will not typically have control over a third party's records. *See, e.g.*, *Rocky Mountain Wild*, 878 F.3d at 1264. For example, when the request is for a third party's internal records that the agency has never received or

reviewed, that fact alone will typically lead most, or all, of the relevant factors to point away from a finding of control. *See, e.g.*, *Zinke*, 278 F. Supp. 3d at 197-99; *Physicians Comm. for Responsible Medicine v. U.S. Dep't of Agric.*, 316 F. Supp. 3d 1, 10 (D.D.C. 2018); *Beveridge & Diamond*, 85 F. Supp. 3d at 240; *ExxonMobil*, 828 F. Supp. 2d at 106-08.

On occasion, however, some courts have found, under the totality of the circumstances, that an agency had *constructive* control of a record—i.e., control without actual possession. *See, e.g.*, *Burka*, 87 F.3d at 515; *Chicago Tribune*, 1997 WL 1137641, at *15. In *Burka*, for instance, the court reasoned that the agency had "constructive control" over data tapes generated by its contractor because the agency "ordered [the] creation of the [tapes], plan[ned] to take physical possession of the tapes at the conclusion of the project," had "indicated it [would] disclose the information after its [study was] completed" while prohibiting the contractor "from making any independent disclosures," and had "relied significantly on the [tapes] in writing articles and developing agency policies." 87 F.3d at 515.

There are reasons to question whether this constructive control theory is consistent with U.S. Supreme Court precedent. The Court in *Tax Analysts* equated "control" with "possession" and did not suggest the possibility of constructive control. 492 U.S. at 145. Thus, several federal courts have declined to adopt the constructive control theory or expressed questions about whether it should be adopted. *See, e.g.*, *Rocky Mountain Wild*, 878 F.3d at 1263 (questioning whether "this 'constructive possession' theory is consistent with Supreme Court precedent"); *Rojas v. Federal Aviation Admin.*, 989 F.3d 666, 677 (9th Cir. 2021) (en banc) ("Documents that are not in an agency's possession do not constitute 'agency records' even if the agency could have obtained them by asking a third party to produce them."); *Bloomberg L.P. v. Board of Governors*, 649 F. Supp. 2d 262, 275 (S.D.N.Y. 2009) ("The Supreme Court's teachings . . . certainly do not compel adoption of the constructive obtainment and control theory . . . ."); *Microsoft Corp. v. IRS*, 2023 WL 255801, at *6 (W.D. Wash. Jan. 18, 2023) (declining to apply the constructive possession test from *Burka*). We, too, arguably rejected the idea of constructive control in our 1995 opinion, emphasizing that governmental possession of records is "fundamental to their being 'public records'" under the PIA. 80 *Opinions of the Attorney General* at 260.

However, we cannot dismiss the possibility that the Maryland courts would recognize constructive control as sufficient in at least

some limited circumstances. More recently than our 1995 opinion, Maryland's highest court has suggested that an agency can sometimes qualify as a PIA custodian even without "immediate physical custody" of records. *See Glass v. Anne Arundel County*, 453 Md. 201, 235-36 (2017). The Court in that case determined that a police department remained a "custodian" of records even though it had delegated storage and maintenance of those records to a separate unit, the county IT department. *See id.* at 235-36. That was because, even though the police department arguably no longer had physical custody of the records, it retained ultimate control over them. *See id.*[6] Thus, although *Glass* involved a somewhat different situation—records that originated with the agency and were later sent out of its direct custody—there is some support in Maryland law for the idea that direct physical custody of a record is not always a prerequisite of "custodian" status (or, in the language of the federal test, for a finding of "control").

Another reason that the Maryland courts might recognize the possibility of constructive control in limited cases is to avoid circumvention of the PIA. The U.S. Supreme Court in *Tax Analysts* noted, albeit in dicta, that the control analysis might incorporate an anti-circumvention component. That is, in resolving the "control" question, the Court suggested that it might consider whether materials were "purposefully routed . . . out of agency possession in order to circumvent [an impending] FOIA request." 492 U.S. at 146 n.6 (alterations in original). Thus, an agency might qualify as having "control" of documents when its lack of immediate possession results from an attempt to circumvent FOIA. *See Rojas*, 941 F.3d at 408. Some federal courts have similarly expressed concern that a "simple possession" standard, without any possibility for constructive control, "would permit agencies to insulate their activities from . . . disclosure by farming out operations to outside contractors." *Ryan v. Department of Justice*, 617 F.2d 781, 785 (D.C. Cir. 1980); *see also Chicago Tribune*, 1997 WL 1137641, at *16-17; *Zinke*, 278 F. Supp. 3d at 197; *cf. Evertson v. City of Kimball*, 278 Neb. 1, 12 (2009) (citing a similar anti-circumvention rationale in holding that some records created by a contractor during an independent misconduct investigation were public records).

Although the PIA does not incorporate any express anti-circumvention principle, it does state a rule of interpretation that

---

[6] Consistent with that view, we have also long said in our Office's PIA Manual that an agency's records "remain 'public records' even if the agency outsources the task of maintaining them to a private contractor." PIA Manual at 1-9.

the Act should generally "be construed" broadly to promote individuals' right "to have access to information about the affairs of government," while at the same time to avoid "unwarranted invasion[s] of the privacy . . . of person[s] in interest." GP § 4-103. That rule of interpretation could favor reading the Act, when possible, to limit circumvention of both the PIA's openness requirements and its mandatory exemptions, at least those that protect personal privacy. Thus, although we do not mean to endorse a test that would recognize records as "public records" even in cases when the PIA's text cannot be read to support that result, a court might well take into account the need to avoid circumvention of the Act when interpreting the terms "made by" or "custodian" in the PIA.[7] For all those reasons, then, we will assume that there are some circumstances under which strict physical possession of records will not always required to satisfy the "control" prong of the *Tax Analysts* test.

### D. Application of the PIA, Informed by Federal Law, to Recordings Used in Delayed Broadcast of Law Enforcement Radio Transmissions

Turning back to your question, how do these principles apply to recordings used to facilitate delayed broadcasts of law enforcement radio dispatch transmissions? We cannot provide a universal response to that question because it will likely require analysis of the totality of the circumstances in each case. However, we can provide some guidance and a framework for analyzing the question.

First, a court would analyze whether the recording is "made by" the law enforcement agency. GP § 4-101(k)(1)(i). In doing so, assuming a third party was involved in the recording's creation, the court would likely focus on the degree of supervision and control exercised by the law enforcement agency over the contractor or other third party that generates and broadcasts the recording. *See, e.g.*, *Burka*, 87 F.3d at 515; *Zinke*, 278 F. Supp. 3d at 196; *Chicago Tribune*, 1997 WL 1137641, at *13-14. In particular, if the agency directed the creation of the particular recording at issue—with extensive supervision and control over that activity—it is more likely a court would find that the agency

---

[7] In the separate context of the Open Meetings Act—which is similarly supposed to be broadly construed to advance its purposes—Maryland's courts have suggested that the statute's terms should be construed so as to "frustrate all evasive devices." *E.g.*, *City of New Carrollton v. Rogers*, 287 Md. 56, 72 (1980) (quoting *Town of Palm Beach v. Gradison*, 296 So.2d 473, 477 (Fla. 1974)).

"made" or "created" the recording than if the agency merely dictated the overall activity or ultimate result of the project. In *Burka*, for example, where the court found the first prong satisfied, the agency had designed the study and specifically directed the collection of particular data. *See Burka*, 87 F.3d at 511-12, 515. But in *Rocky Mountain Wild*, which found the first prong not satisfied, the agency exercised only general supervision over the contractor, not detailed control over its day-to-day performance. *See* 878 F. Supp. 3d at 1261. Apart from the degree of control, a court might also consider the language of the contract, if any, between the law enforcement agency and the third party, especially how it characterizes the relationship between the two and the amount of control that the agency has over the recording process. *See Zinke*, 278 F. Supp. 3d at 196.

Second, a court would analyze whether the law enforcement agency is a "custodian" of the recording. We expect that this analysis, as under the federal test, would focus largely on the extent of control that the law enforcement agency has over the recording after it is made. In considering the amount of control, the court would likely consider, among other factors, the intent of the contractor or other third party to retain or relinquish control over the recordings, the ability of the agency to use and dispose of the recordings as it sees fit, the extent to which agency personnel have accessed or relied upon the recordings, and the degree to which the recordings were integrated into the law enforcement agency's files. *See Zinke*, 278 F. Supp. 3d at 196.

Some specific questions that might matter in this context include where the recordings are stored, who has access to them, and the extent of that access, such as whether the agency has the ability to edit them. *See Center for Bio. Diversity v. U.S. Forest Serv.*, 2025 WL 947472, at *5 (D.D.C. Mar. 28, 2025). Another relevant consideration might be the extent of the law enforcement agency's control over what the third party receives and is able to record in the first place, *see Chicago Tribune*, 1997 WL 1137641, at *15, or the extent of the law enforcement agency's control over what is disclosed to others, *see id.* at *15; *Burka*, 87 F.3d at 515. Similarly, a court might consider the extent of independent judgment exercised by the third party in creating the recording. *See Chicago Tribune*, 1997 WL 1137641, at *15. To be clear, however, a right of access to the recording *alone* is unlikely to support finding constructive control. *See Forsham*, 445 U.S. at 182; *Beveridge & Diamond*, 85 F. Supp. 3d at 237-38.

Finally, in close cases, a court might consider the extent to which the law enforcement agency avoided having control of the recordings for purposes of circumventing the PIA, including its mandatory exemptions. *Cf. Tax Analysts*, 492 U.S. at 146 n.6. In the scenario about which you have asked, that analysis is complicated by the need to accommodate two important considerations that are in some tension here: the PIA's principle of public "entitle[ment] to have access to information about the affairs of government," GP § 4-103(a), which is furthered by providing near-contemporaneous delayed broadcasts of law enforcement dispatch recordings, and the need to prevent evasion of the mandatory exemptions in the PIA that protect privacy interests.

Although we cannot say how these standards would apply to every factual situation, a spectrum of possibilities exists. At one extreme, if the law enforcement agency itself records its own radio transmissions, using its own employees, premises, and equipment, the recording will clearly be a "public record." At the opposite end of the spectrum, a recording of an unencrypted live radio broadcast made by a private citizen is not a "public record," because (among other reasons) the law enforcement agency did not direct the recording's creation and did not control the process for creating the recording, nor is the recording itself in any sense under the law enforcement agency's control.

Between those extremes, whether a particular delayed-broadcast arrangement produces "public records" subject to the PIA's mandatory exemptions will require fact-specific, case-by-case analysis. But again, ultimately, we think that whether a delayed-broadcast arrangement creates "public records" will depend primarily on the degree of control the law enforcement agency has over the creation of the recordings and over the recordings themselves once created. Put simply, the more independence the third party has from the law enforcement agency, the less likely it is that a court would conclude that the recording was "made by" the law enforcement agency or that the law enforcement agency is a "custodian" of the recording. Conversely, the more the third party acts as a mere technological platform for broadcasting, and the less control it exercises over the recording, the more likely it is that a court would conclude that the record was, in substance, "made by" the law enforcement agency.[8]

---

[8] Theoretically, on some facts, the third-party broadcaster itself could be treated as a "unit" or "instrumentality" of State or local government. This is a fact-based and often difficult inquiry that considers "[a]ll aspects of the interrelationship" between the State and the entity in

We recognize that some Maryland law enforcement agencies are already using delayed-broadcast arrangements. We do not have enough details about those arrangements to opine on whether they are consistent with the PIA. Each law enforcement agency will need to determine, after considering our opinion, whether the specific delayed-broadcast arrangement it is using entails the creation of public records. But these questions are far from settled and, given the uncertainty about how the PIA would apply to delayed-broadcast arrangements, we recommend that the General Assembly consider clarifying how the PIA should apply in these circumstances.

### III
### Conclusion

In sum, a delayed broadcasting arrangement is subject to the PIA, and its mandatory exemptions, if and only if it involves the creation of audio recordings that meet the PIA's definition of a "public record." To count as a "public record," a recording or other document must have been "made by" (or "received by") a unit or instrumentality of State or local government. Although a document generated by a third party generally will not qualify as "made by" a government unit or instrumentality, the answer to your question depends largely on the degree of supervision and control exercised by the law enforcement agency over the creation of the recording and over the recording itself. A right of access to the recording, without more, will not make the recording a public record, and the mere fact that a recording is created by a contractor generally will not do so either. But more extensive indicia of control by the agency over the recording process and the resulting recordings may lead a court to conclude that the recordings are "public records" subject to the PIA's exemptions from disclosure. A court might also consider, as a factor in its "public records" analysis, whether a delayed-broadcast arrangement was designed to circumvent the PIA's transparency mandate or its mandatory exemptions. Thus, whether a delayed-broadcast arrangement is covered by the PIA depends on the specific details of the arrangement between the law

---

question. *See, e.g.*, *Andy's Ice Cream, Inc. v. City of Salisbury*, 125 Md. App. 125, 139 (1999) (quoting *A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 35 (1983)). If the third-party broadcaster were itself a public unit or instrumentality, records "made by" the broadcaster alone, in connection with public business, would be subject to the PIA. *See* GP § 4-101(k). But the mere act of receiving and recording police radio transmissions by itself, even under contract with a law enforcement agency, is unlikely to make a third party into a "unit" or "instrumentality" of government.

enforcement agency and the entity that performs the act of recording.

Anthony G. Brown
Attorney General of Maryland

Sara Klemm
Assistant Attorney General

Thomas S. Chapman
Deputy Chief
 Opinions and Advice

Patrick B. Hughes
Chief Counsel, Opinions and Advice